**PACER Cover Sheet**
**for Electronically Filed Documents**

Any data shown here are current as of  06/13/06      . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

**Case Title:**          Furr's Supermarkets, Inc.

**Case Number:**     01-10779

| Document Information |
|:---:|

**Description:**        Declaration of Steven L. Mortenson in support of Chapter 11 Petition and First-Day papers.

Received on:          2001-02-08 11:16:58.000

**Date Filed:**          2001-02-08 11:16:58.000

**Date Entered On**
**Docket:**               2001-02-08 00:00:00.000

| Filer Information |
|:---:|

**Submitted By:**

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date.  To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11-01-10779-SA

In re                                    01-11-_____ ( )

FURR'S SUPERMARKETS, INC.,          :    Chapter 11

                    Company.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### DECLARATION OF STEVEN L. MORTENSEN IN SUPPORT
### OF CHAPTER 11 PETITION AND FIRST-DAY PAPERS

Steven L. Mortensen states that the following is true to the best of his

knowledge, information and belief:

1.      I am the Senior Vice President and Chief Financial Officer of

Furr's Supermarkets, Inc. (the "Company"), a corporation organized under the laws of

the state of Delaware

2.      The executive offices of the Company are located at 4411 The

25 Way N.E., Ste. 100, Albuquerque, New Mexico 87109.

3.      I have been with the Company since January 2000, and have

intimate knowledge of all aspects of the Company's business and its restructuring

efforts. In particular, I am familiar with the Company's day-to-day operations,

business affairs, and books and records.

4.      The Company intends to file a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, and expects thereafter to continue to operate its business and manage its properties as a debtor-in-possession.

5.      To enable the Company to operate effectively and to avoid certain adverse effects of the chapter 11 filing, the Company will request various types of relief in "first-day" applications and motions filed with the Court. I understand from the Company's advisors that debtors frequently file similar motions on the date the bankruptcy is commenced.

6.      I submit this Declaration in support of these first-day applications and motions. For convenience, capitalized terms used but not expressly defined herein have the meaning given them in the first-day applications and motions. Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Company's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts herein. I am authorized to submit this Declaration.

7.      In addition to the motions and applications described herein, the Company is also filing a separate motion seeking authorization to obtain emergency debtor-in-possession financing. I am submitting a separate declaration in support of that motion.

2

8.     Part I of this Declaration describes the Company's business and the circumstances surrounding the filing of the Company's chapter 11 petition. Part II sets forth the certain facts in support of the Company's various first-day applications and motions. Part III summarizes the Company's objectives in the chapter 11 case.

I.     BACKGROUND

A.     The Company's Business

9.     C.W. Furr opened his first general store in Kirkland, Texas in 1904. Today, the Company is a leading regional supermarket chain operating in New Mexico and Western Texas. The Company operates 71 stores and has the leading market share in both the Albuquerque and El Paso areas. The Company also offers on-line shopping through its internet site.

10.     The Company's stores offer a broad selection of grocery, meat, poultry, seafood, dairy, fresh fruits, vegetables and frozen food products. The stores also offer an extended line of non-food products, health and beauty care products, housewares, general merchandise and several in-store pharmacies.

11.     The Company carries all major brands. In addition, the stores offer a variety of private-label products. Generally, each store caries a mix of 75% branded products and 25% private-label products

12.     The Company employs approximately 4,900 employees, the vast majority of whom are hourly employees, most of whom are union members.

3

Total annual payroll exceeds $91 million. The Company is one of New Mexico's largest employers.

 13. The Company's capital structure is complex, including a senior, secured bank facility (approximately $47 million outstanding) and several series of senior and subordinated notes (aggregating approximately $81 million). The Company also has approximately $62 million in capital leases, mostly long-term real estate leases. The Company estimates trade debt at approximately $80 million.

 14. In recent years, the Company's annual revenues have totaled $700-800 million.

B. <u>Events Leading to Chapter 11 Filings</u>

 15. Since 1996, the Company has experienced declining sales and corresponding declines in cash flow. In early 1999, the Company's equityholders decided to replace existing management, in an effort to correct the situation.

 16. In September 1999, the Company appointed a new Chief Executive Officer. In November 1999, the Company sought $20 million in new equity, and obtained $12 million in new investments. Shortly thereafter, the new CEO replaced much of the existing upper management with a team experienced in the management of underperforming supermarkets.

4

17.     The new team put together a business plan for 2000, approached its investors seeking $20 million in additional funding, and were able to obtain $15 million in new funds, followed by $5 million at a latter date.

18.     The Company simultaneously sought a new bank line to replace its existing bank line. In early September, based upon the expectation that the bank line would soon become available, the Company opened two new stores. The Company had expected to close on the new bank line no later than August 2000, but the closing was delayed until December 2000.

19.     At the same time, the Company was also seeking to enter into an equipment and fixtures sale/leaseback agreement. The Company's 1999 losses, combined with the still incomplete bank line, hindered efforts to complete the lease transaction.

20.     The failure to complete this transaction, combined with the cash drain associated with opening and stocking new stores, began to create severe liquidity problems for the Company. These problems were compounded when various trade creditors began to demand stricter credit terms, which limited the Company's ability to increase inventory for the important holiday season in late 2000.

21      When the new bank credit line finally became available, the Company found that, for a variety of reasons, the liquidity that it provided was less than expected. In early January, the Company has struggled to keep its stores fully

5

stocked. Late last week, the Company determined that it would soon be unable to obtain supplies of staple products. The Company commenced its chapter 11 case to obtain access to debtor-in-possession financing and to take advantage of the "breathing spell" provide by chapter 11 to stabilize its operations and develop a reorganization plan.

II.     FIRST-DAY MOTIONS AND APPLICATIONS

A.      Retention of Professionals

Skadden, Arps, Slate, Meagher & Flom LLP

22.     The Company has selected the firm of Skadden, Arps, Slate, Meagher & Flom LLP and its affiliated law practices ("Skadden, Arps") as attorneys because of the firm's experience with and knowledge of the Company and its businesses, as well as its experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

23.     As explained above, in recent years, the Company has generated annual revenues of $700-800 million. The Company is one of New Mexico's largest private employers, with almost 5,000 employees, the majority of which are unionized. There are more than 13,000 creditors in this case, and total claims exceed $280 million. The Company's secured creditors, including the lenders under the proposed debtor-in-possession credit facility, are among the nation's largest and most sophisticated financial institutions.

6

24.    For these reasons, among others, the Company has concluded that it requires the services of a large, national, full-service law firm. The Company needs a firm with expertise and experience, not only in large and complicated chapter 11 cases, but also in transactional, labor, tax, and other legals issues likely to arise in this case.

25.    I believe that continued representation of the Company by its restructuring and bankruptcy counsel, Skadden, Arps, is critical to the success of the Company's reorganization because Skadden, Arps is familiar with the Company's business and legal affairs.

26.    The Company desires to employ the firm of Skadden, Arps under a general retainer because of the extensive legal services that will be required in connection with this chapter 11 case. Accordingly, I believe that Skadden, Arps is both well qualified and able to represent the Company in a timely and efficient manner.

<u>Jacobvitz Thuma & Walker</u>

27.    The Company has elected to retain Jacobvitz Thuma & Walker ("Jacobvitz") as New Mexico co-counsel to the Company in this case. Jacobvitz has long represented the Company, and is thus familiar with the Company and its businesses, as well as its experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

7

28.     The Company desires to employ the firm of Jacobvitz under a general retainer because of the extensive legal services that will be required in connection with this chapter 11 case. Accordingly, I believe that Jocobvitz is both well qualified and able to represent the Company in a timely and efficient manner.

### PricewaterhouseCoopers LLP

29     The Company requires the services of an experienced financial and restructuring consultant to provide professional advice in connection with the Company's chapter 11 case.

30.     Before the Petition Date, PricewaterhouseCoopers LLP ("PwC") provided a range of business and restructuring consultation services to the Company and, as a result, has significant knowledge of the Company's business operations. The Company desire to continue to use the services of PwC in this chapter 11 case.

31.     The Company desires to employ and retain PwC because of its experience and qualifications. The Company submits that in light of PwC's familiarity with the Company, its business and financing arrangements, it would be in the best interest of its estate and cause the least disruption to the Company's businesses if PwC were retained as restructuring accountants and financial advisors to the Company in this chapter 11 case.

8

<u>Robert L. Berger & Associates, LLC</u>

32.    The Company has thousands of creditors, potential creditors and parties in interest, to whom certain notices, including notice of the chapter 11 filing, must be sent. Upon information and belief, I understand that the Clerk's Office is not equipped to efficiently and effectively docket and maintain the extremely large number of proofs of claim that likely will be filed in this case. The sheer size and magnitude of the Company's creditor body makes it impracticable for the Clerk's Office to undertake that task and send notices to the creditors and other parties in interest.

33.    I believe that the most effective and efficient manner by which to accomplish the process of receiving, docketing, maintaining, photocopying and transmitting proofs of claim in this case is for it to engage an independent third party to act as an agent of the Court.

34.    I am advised that Robert L. Berger & Associates, LLC. ("Berger") is a data processing firm that specializes in noticing, claims processing, and other administrative tasks in chapter 11 cases. The Company wishes to engage Berger to send out certain designated notices and maintain claims files and a claims register and believes that such assistance will help permit the Company to focus on its reorganization efforts. The Company believes that Berger is well-qualified to provide the services described in the Application.

9

B.    Payment of Prepetition Wages, Salaries and Benefits

35.    As of the Petition Date, the Company's aggregate workforce consists of approximately 4,900 current Employees.   This total includes a limited number of independent contractors, and similar temporary workers. The Company's workforce consists of approximately 4,320 hourly employees (the "Hourly Employees") and approximately 500 salaried employees (the "Salaried Employees").  More than 3,400 of the Company's personnel are part-time Employees.

Wages and Salaries

36.    The Company's annual payroll for the Employees is approximately $ 91 million.  The Company's total outstanding wage obligations, as of the Petition Date, total $ 1.78 million, plus certain withholding tax obligations, which bring the Company's total outstanding pre-petition payroll obligations to approximately $ 2.1 million.

37.    Certain of the Company's Employees are paid by way of a third-party payroll service.  The Company requests authorization to continue to utilize this payroll service during the pendency of this case.

Other Compensation

38.    The Company offers its Employees other forms of compensation, including vacation pay, overtime pay, and other earned time off, a managerial deferred compensation plan, and reimbursement of certain business expenses (the

10

"Employee Compensation Programs"). Continuation of these Employee Compensation Programs is necessary if the Company is to attract and retain qualified employees to operate its business during this case.

39. _Vacation_. All Hourly and Salaried Employees are eligible for vacation time ("Vacation Time"). Subject to state law exceptions, Employees who retire, resign, or are otherwise terminated are entitled to be paid for their accrued Vacation Time

40. _Overtime, Holiday Pay and Time Off_. Hourly Employees are entitled to earn overtime pay for hours worked in excess of their scheduled time, and are also eligible for "premium pay" for work performed on Sundays and legal holidays. Employees also receive compensation in the form of floating holidays, funeral leave, jury service duty, military leave, sick leave, and accident leave.

41. _Employee Benefit Plans_. Before the Petition Date, the Company offered the Employees certain benefits, including medical, dental, vision, prescription drug, COBRA, basic term life insurance, supplemental life insurance, executive disability insurance, disability insurance, relocation assistance program, payments under garnishment orders, retiree medical plan, and miscellaneous other benefits (collectively, the "Employee Benefits"). The Company estimates that the annualized cost of the Employee Benefits is approximately $ 38.9 million.

11

42.     The Company provides medical benefits through a self-insured program, supplemented by a stop-loss insurance policy. Two third-party administrative companies provide the Company's with claims management and general administrative services in connection with the self-insured medical plans, and the Company expressly requests authorization to continue to use these firms in the normal course of the Company's operations.

Pension and Retirement Plans

43.     Pension Plans. Many of the Company's Employees participate in the firm's pension plan, which is fully funded. Unionized Hourly Employees receive pension benefits through their unions. The Company partially funds these union pensions through per-Employee contributions, as set forth in the various unions' collective bargaining agreements, and are further discussed below.

44.     Retirement (401(k)) Plan. The Company offers certain eligible Employees the opportunity to participate in a 401(k) (the "Plan"). The Plan provides for salary deferral of up to 15% of an Employee's annual salary. The Company's contributions to the Plan are based on matching a percentage of the Employee's savings. Specifically, the Plan provides that Employees are eligible for a matching contribution by the Company of $.25 for each dollar of the first 2% of the Employee's deferred salary. As of the Petition Date, the Company was holding approximately $50,000 in unremitted employee contributions and company matching payments.

12

Workers' Compensation Insurance

45.    The Company provides workers' compensation coverage to the
Employees at each of its stores through a self-insured workers' compensation program.
In New Mexico, the Company's workers' compensation obligations are reinforced by a
letter of credit, in the amount of $ 2.0 million. In Texas, the Company provides
workers' compensation by way of a self-funded salary continuance program.

46.    The Company seeks authority to continue to manage and fund
its workers' compensation programs and to pay prepetition claims, settlements and
assessments arising under these programs, including, but not limited to, payments for
lost wages, permanency, disfigurement, medical expenses, commutations and settled
claims.

47.    It is critical that the Company be permitted to continue to
manage its established workers' compensation programs, as alternative arrangements
for coverage would certainly be more costly. The failure to fund these programs and
to provide continuing workers' compensation coverage will likely result in severe
hardship to Employees, many of whom rely on these payments to pay their living and
medical expenses, and may subject the Company and/or its officers to penalties.

Unionized Employees

48.    Many of the Company's Employees are unionized. The
Company's collective bargaining agreements (the "Collective Bargaining Agreements")

13

with its unions establish pay rates, staffing levels, overtime pay, holiday pay, and other benefits. The Collective Bargaining Agreements require that the Company contribute certain amounts to the various unions for benefit plans such as health and welfare, pension, supplemental pension, legal and educational assistance (the "Union Benefit Payments"). As of the Petition Date, the Company was holding accrued, but unremitted Union Benefit Payments of almost $500,000.

49. The Company also withholds union dues from Employees' paychecks, and remits these dues to the appropriate union. As of the Petition Date, the Company was holding approximately $74,600 in withheld, but unremitted union dues.

50 Although the Company seeks authority to continue to honor its obligations under the Collective Bargaining Agreements, it does not seek, at this time, entry of an order assuming or rejecting the Collective Bargaining Agreements.

Social Security, Income Taxes, and Other Withholding

51. The Company routinely withholds from Employees' paychecks amounts that the Company is required to transmit to third parties. Examples of such withholdings include Social Security, FICA, federal and state income taxes, garnishments, health care payments, retirement fund withholding, savings, and charitable donations.

14

52.    The Company believes that these withheld funds, to the extent that they remain in its or its agent's possession, constitute monies held in trust and therefore are not property of the Company's bankruptcy estate.

53.    I understand that the Bankruptcy Code gives priority up to $4,300 per individual for prepetition claims for wages, salaries, vacation and sick leave and claims for contributions to employee benefit plans. I believe that almost all of the prepetition employment obligations owed by the Company are entitled to priority under the Bankruptcy Code and that all Employees are owed less than $4,300 in wages, salaries, vacation and sick leave and contributions to employee benefit plans as of the Petition Date. Further, even if the Company was to owe prepetition employment obligations greater than $4,300 to any one Employee, the Company believes that such amounts would still be authorized under the Bankruptcy Code as a payment that is necessary to effectuate a successful reorganization.

54.    The Company's ability to rely on its Employees is a key component of the success of its business. The Company's failure to pay the prepetition employee obligations is likely to create extreme personal hardship for the Employees, who rely on such wages and salaries to pay their basic living expenses and who use their employee benefits to secure the health and financial welfare of themselves and their families. Such a result would destroy Employee morale and result in unmanageable Employee turnover. The Company believes that any significant deterioration in

15

morale at this time will substantially and adversely impact the Company and its ability to reorganize, thereby resulting in immediate and irreparable harm to the Company and its estate.

55.     The Company further believes that the payment of amounts necessary to cover the prepetition employee obligations is reasonable compared to the losses that the Company likely will suffer if those amounts are not paid, i.e., the loss of Employee morale and the resulting loss of the services that such Employees provide. Moreover, this payment should not prejudice other creditors nor materially affect the estate, since these claims are entitled to payment in full under the Bankruptcy Code.

C.     Customer Service Policies, Programs and Practices

56.     In the ordinary course of business, and as is customary with most grocery store chains, the Company maintains certain Customer Satisfaction Practices. The Company seeks authority to maintain and to honor prepetition obligations related to those Customer Satisfaction Practices, which, include, but are not limited to, the following:

57.     Rain Check Policy. The Company maintains a traditional rain check policy (the "Rain Check Policy") under which the Company issues "rain checks" for weekly advertised items that are not in stock and for which no like product is available for sale. Customers may redeem rain checks at the advertised price of the out-of-stock items by presenting them at the supermarket checkout counter. If the

16

Company offers a substitute for the advertised item, it will not issue a rain check and instead will sell the substitute at the price advertised for the out-of-stock item.

58.     Return, Refund and Exchange Policies.  The Company has traditionally maintained return, refund and exchange policies to accommodate its customers' needs (collectively, the "Return and Exchange Policies"), including, for example, the "Double Your Money Back" program, which permits customers dissatisfied with a particular product to return the product for twice the amount originally paid. These Policies protect the Company's customers in the event that merchandise purchased is the wrong brand, stale, damaged, defective or otherwise unsatisfactory.

59.     The Gift Certificate Program.  As a further accommodation to its customers, the Company maintains a program by which customers can purchase gift certificates which may be redeemed for merchandise at a later date (the "Gift Certificate Program").  The Company typically sells the gift certificates at face value, but customers who purchase certain volumes of gift certificates through the Company's corporate headquarters may receive a discount on the total purchase price.

60.     The Coupon Programs.  The Company also maintains several coupon redemption programs (the "Coupon Programs").  Under these Coupon Programs, the Company (i) redeems its own paper coupons that are included in advertisement circulars, (ii) redeems paper coupons distributed through certain third parties on behalf of the Company, (iii) honors third-party manufacturers' paper

17

coupons distributed to the Company's customers by the manufacturers, either through the mail or in periodicals, (iv) honors paper coupons distributed to new residents in the Company's marketing areas through the Company's proprietary "new home owners' mailers" and (v) honors electronic coupons that are included in advertisement circulars and then redeemed by consumers who are members of one of the Company's preferred customer programs, including the Furr's Club Program and the Newsamerica Smartsource Program, a pilot program in 12 of the Company's stores.

61. When a customer or employee redeems a valid paper coupon in one of the Company's stores, the Company deducts the appropriate amount from the item's purchase price at the point of sale. In the case of third-party and manufacturer coupons, the Company collects the coupons and delivers them to the respective party through a processing agent in return for a cash refund equal to the aggregate face amount of the coupons plus a small processing fee.

62. As with paper coupons, the Company offers electronic coupon discounts on various items based on the Company's own and manufacturers' coupon programs to customers who are members of one of the Company's preferred customer programs. Customers redeem electronic discounts by presenting their loyalty cards (currently, the Furr's Club Card and the Furr's Smartsource Card) evidencing their membership at the Company's stores at the time of checkout.

18

63. State Lotteries. The Company sells lottery tickets (the "Lottery Sales") at certain of its stores in New Mexico and West Texas. Each store deposits the proceeds of Lottery Sales into its depository bank account. Each week, each state debits the Company's bank accounts in the amount of the prior week's Lottery Sales. The states compensate the Company for making the Lottery Sales by paying the Company a percentage of the sales, which varies by state.

64. Continuation of the Lottery Sales is important to the Company's ongoing business operations. Not only does the Company earn money directly from the sale of the lottery tickets, but it is also compensated indirectly because the lottery sales attract customers to the Company's stores. If the Company prevents a State from collecting prepetition lottery proceeds, the State may terminate its lottery sales agreement with the Company, adversely affecting the Company, its estates and creditors.

65. Money Orders and MoneyGrams. The Company has an arrangement with Travelers Express Co., Inc. ("Travelers") whereby the Company's stores offer customers the ability to purchase money orders for cash (the "Money Orders"). To obtain a Money Order, a customer pays the principal amount of the Money Order plus a small transaction fee to the Company's courtesy counter representative. The Company pays Travelers in advance for the Money Orders  Once the Company sells the Money Orders to its customers, the Company processes the

19

customers' payments in accordance with the Company's ordinary course cash management system.

66.    As an additional convenience service, through a relationship with Wells Fargo Bank, the Company also sells wire transfers ("MoneyGrams") to its customers. As with the Money Order program, a customer pays the principal amount of the MoneyGram, plus a small transaction fee, to the Company's courtesy counter representative. The funds are then wired by Wells Fargo to the location specified by the customer. The Company deposits the receipts from its customers in payment of the MoneyGrams into an account maintained at Wells Fargo specifically for this purpose. Wells Fargo collects the deposits from the Company's MoneyGram account on a daily basis.

67.    The convenience of purchasing Money Orders and MoneyGrams attracts many customers to the Company's stores. Discontinuing the sale of Money Orders and MoneyGrams will not only eliminate a direct source of income generated by the sales of the Money Orders and MoneyGrams themselves; it could also indirectly impact the Company's income by engendering customer dissatisfaction, which, in turn, could result in customer flight and reduced sales.

68.    Coinstar Deposit Program. The Company provides Coinstar machines in its stores ("Coinstar Deposit Program"), which allow customers to bring their change to the store, deposit it into the machines and receive a receipt for use to

20

purchase goods or receive cash back. The deposits of receipts from the Coinstar machines are transferred via Automatic Clearing House to the Company's Concentration Account.

69.     Recycling Program.     The Company offers a program whereby customers may receive $ .25 cash compensation for returning recyclable six-pack wine carriers (the "Recycling Program").

70.     Charitable Contribution.     The Company's commitment to its customers extends to the various communities in which the Company's stores operate. As part of its commitment to these communities, the Company has established the Furr's Foundation, through which it conducts various fundraising events to raise money from partner vendors and employees, which it contributes ("Charitable Contributions") to community organizations, such as the United Way and the Boy Scouts of America.   In addition, through a partnership with Escrip, Inc., the Company has established the Escrip Program (the "Escrip Program"), through which its customers may elect to have a percentage of their total purchases donated to a charity of their choice.

71.     The Company's Charitable Contributions and the Escrip Program provide enormous benefit to the communities in which the Company operates, as well as creating goodwill among its customers and suppliers. The loss of the ability to continue such contributions, to participate in the Escrip Program and to

21

honor prepetition commitments to charitable organizations would result in a loss of the Company's stature among its community constituents.

72. Other than the small fraction of revenues from customers who have chosen to participate in the Escrip Program, none of the funds contributed to charity under the charitable programs comes from the Company's revenues or other assets. Except with respect to the fractional Escrip revenues, the Company does <u>not</u> seek authorization in this Motion to make original charitable contributions but merely to forward charitable contributions collected from others to the intended beneficiaries.

73. <u>Direct Marketing Programs</u>. To reward loyal customers and to re-attract customers with declining purchasing records, the Company has implemented various direct marketing programs ("Direct Marketing Programs") Under these programs, the Company offers its loyal customers favored customer incentives, such as coupons for free items, and offers customers whose purchases have declined coupons for discounts on various items as an incentive to return.

74. These Direct Marketing Programs have been successful in preserving the customer satisfaction and loyalty of the Company's favored customers and in re-establishing the customer loyalty of customers who have strayed. The loss of these Direct Marketing Programs could have a negative impact on customer satisfaction, loyalty and sales.

22

75.    <u>General Customer Satisfaction</u>.  Although the Company makes every effort to provide its customers with a completely satisfactory shopping experience, there are some occasions when a customer is dissatisfied.  To preserve its customer relationships, the Company will often provide a dissatisfied customer with a letter thanking the customer for his or her patronage, with a gift certificate as a sign of the Company's commitment toward correcting the problem.

76.    <u>On-Line Shopping Services</u>.  To enhance customer convenience and simplify the shopping experience, the Company offers on-line shopping services ("On-Line Shopping Services") for customers in the Albuquerque, Santa Fe and West El Paso areas at its website, furrs.com.  On furrs.com, customers may select the items they wish to purchase and are offered the option of picking up their prepared order at one of the Company's stores or having their order delivered to their homes for a nominal fee.

77.    <u>Customer Protection Program</u>.  In the ordinary course of business, the operation of the Company's stores inevitably generates minor personal injury claims.  When a customer reports an accident or injury to a store manager, the Company's in-house claims adjusters review the circumstances.  If the claim appears valid, the Company will frequently offer a small cash payment to settle the dispute and maintain customer good will.  These settlement payments average approximately $16,000 per month, or an average of approximately $230 per week per store.  The

23

typical settlement is $500 or less, although some are more. The Company believes that customer loyalty and customer-employee relations would suffer if it failed to make payments under this program on account of prepetition accidents or injuries.

78.    Discount Programs. In an effort to enhance employee-customer satisfaction, the Company has established an Associate Discount Program under which the Company offers its employees a 5% discount on purchases greater than $30. In addition, the Company has established the Value Partners Program, which offers discounts similar to the Associate Discount Program to selected suppliers. Members in the Discount Programs obtain their discounts by presenting cards evidencing their membership at the Company's stores at the time of checkout.

79.    Other Policies. The Company maintains certain other consumer policies (the "Other Policies"), including, postage stamp sales, rug cleaner rental and customer utility bill collection and payment, which are designed to enhance customer satisfaction. The success and ultimate viability of the Company's business is dependent upon customer satisfaction and loyalty. The uninterrupted maintenance of its Customer Satisfaction Practices is essential to maintaining that satisfaction and loyalty. The disruption and adverse publicity that would necessarily result from a failure to meet customer obligations or to continue its Customer Satisfaction Practices would threaten the Company's customer base and ultimately threaten its ability to reorganize successfully.

24

80.     The Company cannot quantify precisely the aggregate amount of outstanding obligations with respect to these Practices. The Company budgets approximately $100,000 per week for coupon redemptions, and typically issues approximately $2,500 per week in rain checks (although it has issued more in recent weeks). Regardless of the aggregate amount, these Practices bring customers into the stores and generate sales and additional revenues.

D.      Reclamation Claims & Post-Petition Delivery of Goods

81.     In the ordinary operation of the Company's business, numerous Vendors provide the Company with millions of dollars of Goods every month. On a daily basis, Vendors deliver approximately $1.2 million of Goods to the Company's facilities. On average, the Company's stores turn over their inventory every 35 days. The Company currently has approximately $56 million in inventory (at cost) on its store shelves and approximately $12.5 million in inventory (at cost) in its El Paso warehouse.

82.     As of the Petition Date, the Company had numerous Outstanding Orders with Vendors. As a result of the filing of this chapter 11 case, many Vendors may likely be concerned that if they deliver or ship Goods after the Petition Date under an Outstanding Order, they will become general unsecured creditors of the Company's estate.

25

83. Accordingly, some Vendors will likely decline to ship or instruct their shippers not to deliver Goods destined for the Company, unless the Company issues substitute purchase orders postpetition or obtains an order of this Court confirming that all of the Company's obligations arising from Outstanding Orders that are fulfilled postpetition will be granted administrative expense status under section 503(b)(1)(A) of the Bankruptcy Code.

E.    Prepetition PACA Trust Claims

84. Before the Petition Date, certain of the Company's vendors sold goods (collectively, the "PACA/PASA Goods") to the Company that constitute (i) "perishable agricultural commodities," as this term is defined by the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499, et seq. ("PACA"), (ii) "livestock" or "poultry," as these terms are defined by the Packers and Stockyard Act, 7 U.S.C. §§ 181, et seq. ("PASA"), or (iii) other eligible goods covered by state statutes of similar effect.

85. The Company currently estimates that, as of the Petition Date, it owes approximately $43,000 in PACA Trust Claims. The Company believes that there is currently no amount owing under PASA.

86. Based on the foregoing, the Company feels that it is in the best interest of the estates to pay valid, uncontested PACA Claims in the ordinary course of business.

26

F    Prepetition Sales, Use and Other Taxes and Certain Fines and Penalties

87    The Company, in the ordinary course of its business, incurs various obligations to certain local, state and federal governmental entities. These obligations include tax payments (the "Taxes"), such as state and local sales and use tax liabilities ("Sales and Use Taxes"). Before the Company's bankruptcy petition was filed, the Company paid these obligations in a timely fashion.

88.    Sales and Use Taxes accrue in the daily business practice of the Company, and are calculated based upon a statutorily mandated percentage. In some cases, Sales and Use Taxes are paid in arrears, once collected by the Companys.

89.    New Mexico and Texas require the Company to remit estimated Sales and Use Taxes on a periodic basis during the month or quarter in which sales are made. The Taxing Authority then "trues up" any deficiency or surplusage on the date on which the Taxes are actually due.

90.    The Company also seeks authority to pay certain prepetition fines and penalties (the "Fines") assessed to the Company in connection with certain local, state and federal compliance requirements with respect to store safety and sanitation, food safety and sanitation, and packaging and labeling integrity. The Company believes that fines totaling only approximately $6,000 are outstanding.

91.    For the foregoing reasons, the Company believes it is in the best interest of the estate to pay the Taxes owed in Texas and Fines.

27

### G. Use of Existing Cash Management System

92. The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor-in-possession bank accounts; (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes including payroll taxes; (iii) maintain a separate debtor-in-possession account for cash collateral; and (iv) obtain checks for all debtor-in-possession accounts which bear the designation "Company-in-Possession," the bankruptcy case number and the type of accounts. As set forth more fully below, under the circumstances of this case, enforcing these requirements would seriously disrupt the Company's operations and provide little benefit to the Company's estate and creditors.

### The Company Should Be Granted Authority to Maintain Its Existing Bank Accounts

93. Before filing its chapter 11 case, in the ordinary course of its business, the Company maintained approximately 90 bank accounts (the "Bank Accounts"). All of the Bank Accounts are in financially stable banking institutions and are subject to FDIC insurance. A list of all the Bank Accounts, along with names and addresses of the institutions, the purposes of the Bank Accounts, and the Account numbers, is attached to this Motion and the proposed Order as Exhibit A.

28

94.     The Company's Bank Accounts are part of a carefully con-
structed and integrated cash management system, more fully described below, that
insures the Company's ability to monitor and control cash efficiently.

95.     Closing a bank account and opening a new account typically
requires several days. The replacement of the Company's more than 90 accounts
would be time-consuming, expensive, and distract the Company's financial personnel
and the managers at each store from other, more critical responsibilities. Moreover,
the existing account numbers are incorporated into the Company's central accounting
and reporting systems, and a complete change would require recoding much of the
software in it accounting systems.

96.     It would take significantly longer for the Company to replace its
General Payables Account, its principal disbursement account. That is because the
check stock for that account includes microcode information used in maintaining the
Company's accounts. It would take several weeks to replace that account and the
check stock, and it would be difficult for the Company, using its existing systems, to
maintain accurate records without similar check stock.

97.     Closing existing accounts would generate no benefit to the
estate to compensate for this extreme disruption. Most of the accounts are deposit
accounts that are swept daily, so there is no risk that improper payments will be made
from those accounts. With respect to the General Payables Account, the Company

29

will insure that there is a significant gap in the check numbers of prepetition checks and those written postpetition. The Company will instruct the Bank to honor checks only bearing the higher, postpetition numbers. There will be no risk of improper postpetition payments on prepetition debt from that account. Therefore, subject to a prohibition against honoring payment of prepetition debt without specific authorization from this Court, the Company requests that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period, be authorized

## The Company Should Be Granted Authority to Continue to Use Existing Business Forms and Checks

98.     In order to minimize expenses to its estate, the Company also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.) and checks existing immediately before the Petition Date, without reference to the Company's status as a debtor-in-possession.

99.     Parties doing business with the Company undoubtedly will be aware, as a result of the size and public knowledge of this case, of the Company's status as a chapter 11 debtor-in-possession. Changing correspondence and business forms would be expensive and burdensome to the Company's estate and disruptive to the Company's business operations. For these reasons, the Company requests that it

30

be authorized to use existing checks and business forms without being required to place the label "debtor-in-possession" on each until the existing stock is depleted.

**The Company Should Be Authorized to Continue to Use Its
Existing Cash Management System**

100. The Company maintains a carefully constructed and integrated cash management system that ensures its ability to monitor and control its cash efficiently. To avoid disruption of its operations and ensure an orderly transition into chapter 11, the Company requests authorization to continue the use of its existing cash management system as it may be modified in connection with contemplated debtor-in-possession financing (the "DIP Facility"), authority for which will be sought by separate motion, or as required in the ordinary course of business. A flow chart showing the Company's cash management system is attached to this Motion and the proposed Order as Exhibit B.

Summary of Existing Cash Management System

Deposits and Receivables

101. The principal components of the Company's cash management system for deposits and receivables are as follows:

(a) <u>Concentration Account</u>. The Company's cash management system is designed around a single concentration account (the "Concentration Account"), maintained at Wells Fargo Bank of New Mexico ("Wells Fargo"). Funds deposited into the Concentration Account are sent by wire transfer to a blocked

31

account maintained by Heller Financial. The blocked account is then used to pay the Company's obligations to its lenders and to fund the Company's wire transfer account (the "Wire Transfer Account").

        (b)    <u>Store Deposits Into the Concentration Account</u>. Each of the Company's store locations makes daily deposits of funds, received from the prior day's business, into depository accounts (the "Depository Accounts"), for subsequent deposits into the Concentration Account. Each store readies its daily receipts for deposit, and the deposit is then transported to the depository banks by an armored car service. Store deposits are concentrated from field Depository Accounts into the Concentration Account by ACH debits. Deposit information is collected through daily balance reporting, and ACH transfers are input into Wells Fargo's system. Wells Fargo initiates ACH transfers from the field banks' Depository Accounts into the Concentration Account.

        (c)    <u>Other Deposits Into Concentration Accounts</u>.

        (i)    <u>Third Party Credit Cards</u>. Proceeds from purchases made using the Company's online shopping site using third party credit cards are wire transferred to the Concentration Account, based on transaction files that are transmitted daily to the applicable third party payment processors.

32

(ii)    Coinstar Deposits.  The Company provides Coinstar machines in its stores, which allow customers to bring their change to the store, deposit it into the machine and receive a receipt for use to purchase goods and/or receive cash back.  The deposits of receipts from the Coinstar machines are transferred via ACH to the Concentration Account.

(iii)    Electronic Benefit Transfers.  The Company receives electronic benefit transfers ("EBT"), such as food stamps, and Widow, Orphan and Children ("WIC") checks as payment for goods at its stores.  The receipts from WIC checks and coupons are deposited into an account at Bank One; and the receipts for other EBTs are deposited into an account at First Security Bank of NM ("FSB"). The Bank One account is swept by an ACH transfer, and the FSB account zero balances into a separate account at FSB.  Those funds are then wire transferred to the Concentration Account.

(iv)    Corporate Accounting.  The Company's corporate accounting department is located at the Company's headquarters in Albuquerque.  The accounting department deposits checks directly into the Concentration Account.

Payables and Disbursements

33

102.    The principal components of the Company's current consoli-
dated cash management system for disbursements and payables are as follows:

(a)        Controlled Disbursement Accounts. Check
disbursements are funded through controlled disbursement zero balance accounts
("ZBA") maintained at FNB for the following functions: (A) nonexecutive payroll,
(B) general payables, and (C) group benefits. Funds are sent via wire transfer from the
Blocked Account to the Furr's Wire Transfer Account maintained at Wells Fargo.
Funds are then transferred to an FSB "shadow" account and sent by wire transfer to
the accounts at FNB. FSB acts in a correspondent relationship with FNB to enable
the payment from the FNB controlled disbursement accounts.

(i)        Non-Executive Payroll. The
Company's hourly and non-executive salaried employees are paid by
check from a controlled disbursement payroll account at FNB. Checks
are issued both weekly and biweekly depending on the nature of the
employment. Nearly all payroll checks issued from this account are
cashed within the first week after issuance.

(ii)        General Payables. The Company
issues checks from a ZBA payables account at FNB for nearly all of its
payables, including vendor payments. The Company's other payables,
including payroll, group benefits claims, workers compensation claims,

34

certain vendor payables, general liability claims, employee flexible spending accounts, and trust fund taxes are discussed in more detail herein. To prevent improper payment of prepetition debt from the General Payable Account, the Company will insure that postpetition checks drawn on that account will be easily determined by check number.

(iii)    <u>Group Benefits Trust</u>.  The Company has self-funded its employee medical, dental, vision and prescription drug programs.  Employees submit claims to the Company for payment, and the Company issues checks from its ZBA group benefits trust account maintained at FNB.  The group benefits trust account is not funded by the Company until checks are presented by employees for payment.  The average weekly payments made from this account total approximately $202,000, with an average employee claim of $330.

(b)    <u>Executive Payroll</u>.  The Company's executive payroll is issued by a payroll service.  Executives are paid on the last day of the pay period on a biweekly basis.  The Company prefunds an executive payroll account maintained at Wells Fargo bank on the Thursday before payroll is issued.  The majority of the

35

executive payroll is by direct deposit with few, if any checks issued by the payroll service.

(c)      <u>Trust Fund Taxes</u>. The Company wires funds from its Wire Transfer Account at Wells Fargo to a ZBA account at FSB for payment of payroll and sales taxes. The ZBA is funded immediately before the taxes are due. Payroll and sales taxes are then swept by the taxing authorities via ACH transfers. The Company's officers may be liable for payment of these taxes if payments are not made when due.

(d)      <u>S&B Beverage Account</u>. The Company maintains an account at Plains National Bank ("PNB") for payment of its liquor inventory in Texas. Texas law prohibits a New Mexico company from selling liquor in Texas. Thus, the Company funded its liquor licenses, but S&B Beverage Company holds the licenses for the Company's Texas stores. S&B also provides liquor inventory to the Company's Texas stores on a daily basis. When inventory is delivered to the stores, checks are issued to S&B on the PNB account. The Company funds the PNB account daily for approximately $50,000 in inventory purchased from S&B.

(e)      <u>Customer Services</u>. The Company provides two types of disbursement services to its customers at each of its stores – money orders and wire transfers, or "MoneyGrams."

36

(i)    Money Orders. The Company has an arrangement with Travelers Express Co., Inc. ("Travelers") that enables the Company's stores to offer customers the ability to purchase money orders for cash (the "Money Orders"). To obtain a Money Order, a customer pays the principal amount of the Money Order, plus a small transaction fee, to the Company's courtesy counter representative. The Company prefunds Travelers by wire transfer each day in an amount equal to or in excess of the estimated amount of Money Orders to be written that day. Each Tuesday, the prior week's Money Orders are settled with Travelers, which often results in a refund to the Company for overpayments. Because funds are wired directly from the Company's Wire Transfer Account to Travelers, the Company does not maintain an account for Money Orders.

(ii)    MoneyGrams. As a service to its customers, the Company also sells wire transfers ("MoneyGrams") to its customers. As with the Money Order program, a customer pays the principal amount of the MoneyGram, plus a small transaction fee, to the Company's courtesy counter representative. The funds are then wired by Wells Fargo to the location specified by the customer. The Company deposits the receipts from its customers in payment of the

37

MoneyGrams into an account maintained at Wells Fargo specifically for this purpose. Wells Fargo then sweeps the MoneyGram account on a daily basis for wires sold by the Company that day. The Company risks having customers' wire transfers dishonored if this account does not remain open postpetition.

(f) <u>Workers Compensation</u>. The Company is self-insured for its workers compensation liability. The Company's workers compensation account, maintained at Wells Fargo, is a ZBA account and is funded only when claims are presented for payment. The Company may not be able to continue its self-insurance program postpetition, however, and it will take the Company some time to find replacement workers compensation insurance. If the Company is forced to close this account before replacement coverage is in place, employees risk non-payment of their claims.

(g) <u>General Liability</u>. The Company is also self-insured for general liability purposes, although the Company maintains an excess layer of insurance. The Company maintains a ZBA account at Wells Fargo for payment of claims, which is funded only when claims are presented for payment. The Company's average disbursement from this account total only approximately $16,000 per month.

38

## Necessity for the Continued Use of
## The Existing Cash Management System

103.    The Company's cash management system is an integrated

system that includes necessary accounting controls to enable the Company, as well as

creditors and the Court, if necessary, to trace funds through the system and ensure that

all transactions are adequately documented and readily ascertainable. The Company

will continue to maintain detailed records reflecting all transfers of funds.

104.    The cash management procedures the Company uses constitute

ordinary, usual and essential business practices, and are consistent with those used by

other major corporate enterprises. The cash management system provides significant

benefits to the Company, including the ability to (1) control corporate funds centrally,

(2) invest idle cash, (3) ensure availability of funds when necessary, and (4) reduce

administrative expenses by facilitating the movement of funds and the development of

more timely and accurate balance and presentment information. Moreover, the cash

management system facilitates cash forecasting and reporting, monitors collection and

disbursement of funds, and administers the various bank accounts required to effect

the collection, disbursement and movement of cash.

105.    Continued use of the Company's existing cash management

system is critical to the Company's reorganization effort. Requiring the Company to

adopt a new cash management system at this early stage of the case would be expen-

sive, would create unnecessary administrative problems, and will be much more

39

109.     The Company estimates that an additional 30 days (for a total of 45 days), will provide sufficient time to prepare and file the Schedules and Statements.

110.     For the foregoing reasons, the Company believes that granting it additional time to file its schedules and statements of financial affairs is in the best interest of the estates.

I.     Utilities

111.     The Company currently uses gas, water, electric and telephone utility services provided by numerous Utility Companies, including those listed on Exhibit A to the proposed Order. Any interruption in these services would seriously hamper the Company's ability to operate and, perhaps, to reorganize successfully.

112.     Utility services such as gas, water, electricity and telephone service are vital to (a) afford the Company's employees a safe and sanitary work environment, (b) ensure uninterrupted operations at the Company's various stores, warehouse and corporate office, and (c) maintain the Company's computer system through which the Company monitors and integrates its operations, including, but not limited to, its cash management system. Even a temporary interruption in utility services could seriously disrupt the Company's operations.

113.     To the best of the Company's knowledge, as of the Petition Date there are no significant defaults with respect to any utility bills. The Company

41

anticipates that its ongoing business operations will generate cash flow which, when combined with the funds available under its proposed debtor-in-possession financing, will be sufficient to permit the Company to pay all of its postpetition utility bills on a current and ongoing basis.

114.    The absence of significant prepetition defaults, the ability to pay future utility bills, and the administrative expense priority afforded under sections 503(b) and 507(a)(1) of the Bankruptcy Code constitute adequate assurance to the Utility Companies of payment for all future services. Substantial, additional cash security deposits to the Utility Companies are unnecessary and unwarranted.

III.    THE COMPANY'S OBJECTIVES IN THESE PROCEEDINGS

115.    The Company's primary purpose in chapter 11 case is (i) the reduction of the Company's near-term debt service requirements, (ii) the realignment of its capital structure and (iii) the streamlining of its operations. The Company will also investigate the possibility of transactions with potential investors in all or a portion of its operations.

42

116. The Company does not anticipate a prolonged chapter 11 case. With the support of the Company's employees, vendors, customers, and other constituents, the Company believes that the implementation of this plan will resolve its operational and financial difficulties, enhance the Company's viability and profitability, and permit the Company to successfully reorganize and exit from chapter 11 at the earliest possible and appropriate time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 7th day of February, 2001, at Albuquerque, New Mexico.

Steven L. Mortensen

43