UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

PACER Cover Sheet
for Electronically Filed Documents

Any data shown here are current as of 06/13/06 . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

| | |
|---|---|
| **Case Title:** | Furr's Supermarkets, Inc. |
| **Case Number:** | 01-10779 |

### Document Information

| | |
|---|---|
| **Description:** | Memorandum Opinion in support re: [530-1] Order approving consulting agreements with George Golleher and Greg Mays and transition agreement with Thomas Dahlen. |
| **Received on:** | 2001-06-01 08:47:11.000 |
| **Date Filed:** | 2001-06-01 08:47:11.000 |
| **Date Entered On Docket:** | 2001-06-05 00:00:00.000 |

### Filer Information

**Submitted By:**

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date. To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:

FURRS SUPERMARKETS, INC.

    Debtor.                                           No. 11-01-10779 SA

**MEMORANDUM OPINION IN SUPPORT OF ORDER
APPROVING CONSULTING AGREEMENTS WITH GEORGE GOLLEHER
AND GREG MAYS AND TRANSITION AGREEMENT WITH THOMAS DAHLEN**

On 22 May 2001 the Court conducted final hearings on the motion to approve the employment of Peter J. Solomon Co. ("Solomon") as the Debtor's investment banker (doc. 185) and the motion to engage the services of George Golleher, Greg Mays and Thomas Dahlen (doc. 295), and on the written and oral objections to both those motions. This memorandum opinion addresses the latter motion (the "retention" motion). The Solomon motion will be addressed upon receipt of the final version of the Solomon engagement letter.[1]

Present at the hearing were Robert H. Jacobvitz and Richard Levin for the debtor in possession ("Debtor", "company" or "DIP"), William F. Davis and I. William Cohen for

---

[1] The final understanding on the Solomon engagement is to be reflected in a revised engagement letter to be submitted by Messrs Davis and Thuma (for the UCC and the Debtor respectively), which contains concessions negotiated by the UCC. The revised engagement letter will also address a number of the objections raised by the UST. The revised engagement letter should be filed as a separate exhibit in the "pleadings" file in this case.

Page 1 of 15

the Unsecured Creditor Committee ("UCC" or "Committee"), Paul M. Fish for Heller Financial as lender and as agent for other secured creditors, Ronald Andazola for the United States Trustee ("UST"), Jennie Deden Behles for Metropolitan Life Insurance Company, and Mr. Craddock from Desert Feather, Inc., a New Mexico corporation and a creditor. In addition, Michael J. Cadigan filed a brief in opposition to the retention motion on behalf of New Mexico Beverage Company, Inc., Southern Wine & Spirits of New Mexico, Inc. and National Distributing, Inc.

This Court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. §§1334 and 157, this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and these are findings of fact and conclusions of law entered pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The Golleher and Mays portion of the retention motion seeks to approve compensation arrangements to have Golleher and Mays essentially take over and continue with direct management of the DIP, and the Dahlen portion seeks to approve compensation arrangements in view of his leaving the DIP. The Court will approve the motions for the most part in the form proposed to the Court.

BUSINESS JUDGMENT RULE

By ruling on the Golleher, Mays and Dahlen motions, the Court is not denying the DIP's position that these arrangements are ordinary course of business and therefore do not need Court approval; rather, the Court is simply bypassing that question and moving to the "merits" of the contracts and the business judgment rule.

With respect to all these motions, including the Golleher, Mays and Dahlen motions, the DIP argues that the "business judgment" rule is applicable, in either version as articulated by the DIP: (a) the "Delaware" formulation of the rule that says that the substance of the action cannot be challenged as long as the corporation went through the normal and appropriate decision-making process, and (b) the formulation that on the merits these agreements are well within the ordinary range of decisions management is allowed to make in bankruptcy cases. The Court questions whether the "Delaware rule" is appropriate in the bankruptcy context.[2] As

---

[2] In fact, in In re Patriot Aviation Services, Inc., No. 11-98-16029 SR (United States Bankruptcy Court, D.N.M.), this Court distinguished how the business judgment rule functions outside a chapter 11 reorganization (examination of the decision-making process) versus inside the reorganization (examination of the decision-making process plus the probable effect on the chapter 11 case). Findings of Fact, Conclusions of Law, and Memorandum Opinion in Support of Order Denying Debtor's Motion to Assume Contract with Kiwi International

orally argued by the DIP, the rule is that once the board of directors has followed the appropriate procedures for making a decision (including assuring that none of the directors making the decision has an personal interest in the decision being made), the decision is not subject to question. The "other" version (or perhaps merely another version) of the business judgment rule, more commonly used in bankruptcy cases and (at least marginally) more demanding on the debtor in possession, requires the Court to approve the DIP's contract decision unless it is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice."[3] Without ruling on which standard is more

---

Holdings, Inc. and Ordering Rejection of Contract (doc. 91), at 6-7, entered February 5, 1999. The Court's opinion is available on the Court's chambers website at www.nmcourt.fed.us.

[3] Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1047 (4th Cir. 1985), cert. den. sub nom. Lubrizol Enterprises, Inc. v. Canfield, 475 U.S. 1057 (1986) (upholding DIP's rejection of contract). In fact, this "other" standard is little different than the standard as articulated by the Delaware Supreme Court; e.g., Cheff v. Mathes, 199 A.2d. 548, 555, 41 Del. Ch. 494, 506 (1964) (citation omitted) ("It is important to remember that the directors satisfy their burden by showing good faith and reasonable investigation; the directors will not be penalized for an honest mistake of judgment if the judgment appeared reasonable at the time the decision was made."); Sinclair Oil Corporation v. Levien, 280 A.2d 717, 720 (Del. 1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational

appropriate, the Court finds that the decisions to contract with Golleher, Mays and Dahlen under the proposed terms are not manifestly unreasonable – indeed, are well within the bounds of reasonableness -- and therefore should be approved essentially as proposed.

GOLLEHER AND MAYS

The retention motion as amended sought approval for agreements with George Golleher (Debtor's Exhibit 2) and Gregory Mays (Debtor's Exhibit 3). The fees to be paid pursuant to these agreements are in addition to the fees paid to Golleher and Mays as board members. (They had been serving as board members for some months prior to the filing of the petition. Board members receive $16,000/year, plus $1,000 for each board meeting they attend. Board meetings are held about once a month.)

The Golleher agreement provides for a signing bonus of

---

business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment.") Compare Unsecured Creditors Committee v. General Homes Corporation (In re General Homes Corporation), 199 B.R. 148, 151-52 (S.D. Tx. 1996) (business judgment rule applies to solvent corporations but "has no consequence in the context of a conservatorship.") While the facts of the General Homes case may well have justified the court's refusal to approve the DIP's compensation agreements with its officers, see below at page 7, the blanket statement about the inapplicability of the business judgment rule to bankruptcy cases is simply incorrect.

$125,000[4], a monthly "service fee" (for services rendered;
Golleher is not an employee of the Debtor) of $25,000,
reimbursement of expenses, indemnification and a "Success
Bonus" (1/3 of the success Bonus goes to Mays) of a minimum of
$750,000 and a maximum of somewhere in the neighborhood of
$5,000,000. Note: the $750,000 essentially constitutes
compensation that is paid at the end of the process rather
than at the start of the engagement; and to the extent that
the Success Bonus approaches $5,000,000, it means that there
will have been a substantial return for the unsecured
creditors.

The Mays agreement provides for a signing bonus of
$125,000, a monthly "service fee" (for services rendered; Mays
also is not an employee of the Debtor) of $25,000,
reimbursement of expenses, indemnification and a "Success
Bonus" (2/3 of which goes to Golleher) of a minimum of
$750,000 and a maximum of somewhere in the neighborhood of
$5,000,000.

The UST argues that the approval of Golleher and Mays
implicates §327. The DIP argues otherwise. Although the

---

[4] Debtor's brief in support of the motion filed May 4,
2001, at 3 (doc. 424) says that a $125,000 signing bonus will
be shared by the two of them; the agreements themselves say
that each will receive $125,000 on signing. An errata notice
(doc. 435) corrects the error in the brief.

Page 6 of 15

Court does not find altogether persuasive the various rationales employed in the three cases cited by the DIP[5], the Court does not believe that Golleher and Mays need to meet the requirements of §327. The DIP needs to be able to "say who it is", and it does that by saying who is going to make the decisions for it and give the orders to the professionals. (A corollary is that courts usually do not interfere in contests to determine the make up of the board of directors who are the ones who appoint management.) In other words, the DIP gets to determine who will be its executive officers even if they are called "crisis managers". Note that the DIP brief describes the duties of Golleher and Mays as to "serve, jointly, as the debtor's chief executive" (although they are called "Non Executive Chairman" and "Non Executive Vice Chairman" respectively in their contracts).

Aside from the §327 issue, it does make sense for the DIP to seek approval of these agreements with Golleher and Mays since it is certainly possible that a DIP could abuse the process of compensating its executives. See, e.g., Unsecured Creditors Committee v. General Homes Corporation (In re

---

[5] In re Seatrain Lines, Inc., 13 B.R. 980 (Bankr. S.D.N.Y. 1981); In re Park Ave. Partners Ltd. Partnership, 95 B.R. 605 (Bankr. E.D. Wis. 1988); In re D'Lites of America, Inc., 108 B.R. 352 (Bankr. N.D. Ga. 1989).

General Homes Corporation), 199 B.R. 148 (S.D. Tx. 1996) (during "gap" period following filing of involuntary petition and entry of order for relief, board members substantially increased their compensation as officers without justification and without complying with corporate requirements).  If a DIP does not seek approval, the creditors may be left only with drastic remedies such moving to convert or appoint a trustee. Limiting creditors to those remedies is not an efficient way to run the system.

The roles of Golleher and Mays, especially the former who has the duty, among others, of seeking buyers for the company, do not duplicate Solomon's role, if for no other reason than there is a distinction between the professional, who offers advice but ultimately is charged with obedience, and the client (in this case, Golleher speaking for the corporation), who gives the instructions or orders.  And this is the fact despite the characterization of Golleher and Mays as "crisis managers".

Given the evidence presented at the hearing, it would be hard to argue that employing the services of Golleher and Mays is not one of the better decisions the DIP has made.  Both of them have substantial successful experience in the retail grocery business and in rescuing insolvent and cash-flow

starved companies.  Upon their taking the helm for the DIP, they discovered that the company had exhausted its post petition DIP financing and was continuing to lose money, and had no strategy to change that situation.  Golleher and Mays immediately changed management's operational focus from one that was "business as normal" (the court's description, not the one used by the witnesses) for a solvent company with a three-year plan that included potential expansion, to a focus on reversing the negative cash flow of the company, repairing the company's damaged credibility with its secured and unsecured creditors, and trying to salvage and add value to the company for a potential sale (more likely) or reorganization (less likely). A measure of their success so far is that even though the company is in default of five of the DIP financing covenants, the secured creditors have not enforced whatever rights they have to put the company's assets up for auction.  (Of course, the Court assumes that the secured lenders have determined that it is in their own best interest not to put the company's assets up for auction despite the violation of the five covenants, so that the Debtor's continued retention of its assets so far is not due solely to the charisma of Messrs Golleher and Mays or the benevolence of the lenders.)

## DAHLEN

The retention motion as amended also asked to pay Dahlen a total of $30,000 at $5,000 per week for 6 weeks (immediately following his resignation on April 6, 2001), and to release Dahlen from the non-compete agreement contained in his contract of February 9, 2001.  The $30,000 (negotiated by Thomas Sikorski for the board down from $130,000) and the release are for transition consulting as needed by DIP and for not recruiting any of DIP's management to leave.  The Transition Agreement between Thomas Dahlen and Furr's Supermarkets, Inc. dated March 26, 2001 (Debtor's Exhibit 1) (two days before Golleher and Mays took over on March 28) provides that he be available, not that he necessarily be consulted.  The testimony was that he had been available albeit he was consulted very little.

However, as UCC counsel elicited on cross examination, there is nothing in Debtor's Exhibit 1 which talks about not recruiting the Debtor's management people, and the written agreement has an integration paragraph.  The Debtor's testimony (presented through board member Sikorski) was that the non-recruit agreement was part of the deal, although Sikorski could not say how long the non-recruit portion of the deal was to last.  Golleher and/or Mays testified that there

were good upper and mid-level management people in place at Furr's, so this provision is of some importance. Dahlen was not at the hearing to aid in the prosecution of the motion (the Court assumes however that he continues to be in favor of the agreement) or to fill in any details. Contract law in New Mexico provides that oral testimony can be supplied not only to clarify ambiguities (although not to change the terms of the contract), but also to confirm that the contract as written correctly reflects what the agreement of the parties was. <u>C.R. Anthony Company v. Loretto Mall Partners</u>, 112 N.M. 504, 507, 511, 817 P.2d 238, 241, 245 (1991). In this case, the only testimony about what the contract was supposed to provide came from the Debtor (through Sikorski), who stated that part of the deal was the non-recruit provision. In consequence, the Court makes its decision based on the assumption that the agreement was intended to include a non-recruit provision, albeit without making any determination of how long the provision was to be effective. (Given that the intention is to have the Debtor reorganized by the end of the year, the provision would presumably last at least that long, but the Court makes no ruling on this point.) Based on this assumption, the Court approves the contract with Dahlen, including the payment to Dahlen of the $30,000. Having Dahlen

Case 01-10779-sh7    Doc 529    Filed 06/01/01    Entered 06/05/01 09:52:00 Page 12 of 16

available during the transition to provide information and other guidance as needed, as Golleher and Mays had to hit the ground running, is a legitimate purpose for the corporation to spend money, even when it is short of cash as it is in this chapter 11 proceeding. The same goes for a non-recruit position, especially when the DIP apparently needs all the experienced management it can retain. These purposes and expenditures are clearly within the realm of the board's business judgment to which this Court should defer.

Mr. Craddock from Desert Feather, Inc. raises a legitimate concern: why are these people getting paid a lot of money when the unsecured creditors are currently going unpaid, and in fact may not get paid anything at all and may themselves end up in bankruptcy as a result? The basic answer is that the only hope for the unsecured creditors to get paid anything is if the debtor survives long enough either to reorganize itself or, as appears more likely, to sell sufficient assets for enough money to pay some percentage of the unsecured claims. Golleher and Mays testified that their task in good part is to get the company back to a positive cash flow and at the same time put together a deal that will result in as much going to the unsecured creditors as is possible within the constraints imposed by the current

situation in which the Debtor finds itself; their.  So the hiring of Golleher and Mays works directly to the benefit of the unsecured creditors.  Their hiring is necessary because the company continues to find itself in a difficult position, as the testimony made clear, although it also appears from the testimony that it is better off than it was when Golleher and Mays took the helm on March 28.  In any event, the money spent currently on Golleher and Mays would not go to paying unsecured debt.

With respect to the Dahlen agreement, as frustrating as it may be for the unsecured creditors to see Dahlen receive payment after what they may consider to be a turn at the helm that plunged this Debtor into the difficulties it is now experiencing, it is still the case that the board determined that there was some value to having Dahlen available for information, consultation, etc., and to ensure that he would not take members of the Debtor's management with him.  Even assuming for purposes of argument that Dahlen was responsible for the Debtor's near demise (and the Court is not making that assumption in fact), that is essentially "water under the bridge", and the Debtor apparently has recognized that fact and is moving forward.  The Court should not and will not overrule that judgment.  It is important to note as well that

Case 01-10779-sh7    Doc 529    Filed 06/01/01    Entered 06/05/01 09:52:00    Page 14 of 16

while the amount involved, $30,000, is a lot of money for a small business, in the larger scheme of this case it is a relatively small amount, and it is important to let the board make the decisions it needs to in order to keep the Debtor on the track to improving financial health and ultimate payment to the creditors.

CONCLUSION

For the foregoing reasons, the agreements between the DIP and (1) Golleher and Mays, and (2) Dahlen are approved. Any objections not in accord with this ruling are overruled. The Court will enter an order in conformity with this opinion.

_____
James S. Starzynski
United States Bankruptcy Judge

I hereby certify that on June 1, 2001, a true and correct copy of the foregoing was either electronically transmitted, faxed, delivered, or mailed to the following:

Robert H. Jacobvitz
500 Marquette NW #650
Albuquerque, NM 87102

I. William Cohen
100 Renaissance Center #3600
Detroit, MI 48243

Richard Levin
300 South Grand Avenue
Los Angeles, CA 90071-3144

Paul M. Fish
P. O. Box 2168
Albuquerque, NM 87103

William F. Davis
PO Box 6
Albuquerque, NM 87103

Ronald Andazola
Assistant U.S. Trustee
PO Box 608
Albuquerque, NM 87103-0608

Jennie D. Behles
PO Box 849
Albuquerque, NM 87103

Michael J. Cadigan
6400 Uptown Blvd. Suite 570W
Albuquerque, NM 87110

Mark S. Craddock
Desert Feather, Inc.
P.O. Box 1565
Artesia, NM 88211-1565

*[signature: Mary B. Anderson]*
Mary B. Anderson