# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

## PACER Cover Sheet
## for Electronically Filed Documents

Any data shown here are current as of  06/13/06     . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

**Case Title:**  Furr's Supermarkets, Inc.

**Case Number:**  01-10779

| Document Information |
|---|

**Description:**  Findings of Fact and Conclusions of Law by Re: [17-1] Application To Employ Skadden, Arps, Slate, Meagher & Flom LLP and affiliated practice entities as General Bankruptcy Counsel by Furr's Supermarkets, Inc. .

Received on:   2001-06-27 15:01:39.000

**Date Filed:**   2001-06-27 15:01:39.000

**Date Entered On Docket:**   2001-06-28 00:00:00.000

| Filer Information |
|---|

**Submitted By:**

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date.  To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
FURRS SUPERMARKETS, INC.
    Debtor.                    No. 11-01-10779 SA

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND MEMORANDUM OPINION CONCERNING
DEBTOR'S EMPLOYMENT APPLICATIONS FOR
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
AS CHAPTER 11 COUNSEL FOR THE ESTATE AND
PRICEWATERHOUSECOOPERS AS FINANCIAL
CONSULTANTS FOR THE ESTATE**

On February 8, 2001, Furr's Supermarkets, Inc. ("Debtor
in possession" or "Debtor") filed its chapter 11 petition. As
part of its "First Day Motions", the Debtor in Possession
filed an application to employ Skadden, Arps, Slate, Meagher &
Flom, LLP and its affiliated law practice entities ("Skadden")
as its general bankruptcy counsel, and PricewaterhouseCoopers
("PwC") as its Chapter 11 financial consultant. The Skadden
Application (doc. 17) was supported by the Initial Declaration
of Richard Levin (doc. 18) and the PwC application (doc. 15)
by the Declaration of Loretta Cross (doc. 16). At the hearing
on the First Day Motions on February 8, the Court informed all
parties that it would not enter any interim or permanent
employment orders that day, but would do so only after final
hearings on any objections that might be filed to the
applications. The Court also stated that, if an application
were approved, the order would be effective retroactively to

the date of the filing of the application, or "post facto"[1],
thus accomplishing the same goal as entering an employment
order on the date of the application subject to revoking the
order if the Court were to determine at a later date that the
application in question should not have been granted to begin
with.  Compare In re Sinclair, No 7-94-12905 MS, United States
Bankruptcy Court, District of New Mexico, Memorandum Opinion
and Order Revoking Order Approving Employment of Special
Counsel and Denying Motion for Expedited Approval of
Employment as Special Counsel filed April 29, 1998 (docs. 191
and 190 respectively).[2]

Both the United States Trustee's Office ("UST") and the
Official Unsecured Creditors Committee ("UCC" or "Committee")
objected to Skadden's employment, although only the UST
objected to the rates sought by Skadden.[3]  And the UST

---

[1] F/k/a "nunc pro tunc."  See In re Albrecht, 233 F.3d
1258, 1260 n. 4 (10th Cir. 2000).

[2] The Court also stated that, if employment were approved,
the rates for out-of-state counsel would not be limited to
local rates.  The Court made no commitment at that time to
approve any employment.

[3] Orders approving the employment of Jacobvitz, Thuma &
Walker as (local) co-counsel for the Debtor, with a top rate
of $175.00 per hour, of Davis and Pierce, P.C. as (local) co-
counsel for the UCC, with a top rate of $275.00 per hour, and
of Pepper Hamilton, LLP as counsel for the UCC, with a top
rate of $450 per hour, were all approved without objection
from any party.  Docs. 262, 327 and 357 respectively.

objected to the proposed terms of the employment of PwC and the proposed rates. The UST and PwC resolved their differences about the terms of the employment, so that the remaining issue with respect to that application is only as to rates.

On April 20, the Court conducted an evidentiary hearing on the applications and the objections thereto. On April 26, the Court faxed a letter to counsel stating that it would approve the employment of both firms subject to certain conditions stated in the letter[4], with the promise that the Court would enter a formal order and memorandum opinion as soon thereafter as reasonably possible. This is the promised memorandum opinion.[5] The Court, having reviewed the PwC application and the papers filed for and against it, has satisfied itself that the UST filed legitimate objections to the original proposed terms of employment, and that the objections have been appropriately resolved, other than the issue of rates. Therefore the discussion in this memorandum about §327 issues is limited to the Skadden employment.

_____

[4] The court also sent a second letter, doc. 411, which it subsequently "withdrew" following a hearing that stretched over two days. See minutes of May 9, 2001 hearing. Doc. 438.

[5] This memorandum constitutes findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 4 of 49

The Debtor is a regional supermarket chain, with operations in New Mexico and West Texas. At the start of this case, the Debtor operated 71 stores (now down to 66), and employed about 4,900 individuals. Its filing resulted in what is to date apparently the largest Chapter 11 case in this jurisdiction. The parties concede, tacitly or otherwise, that no local firms have the resources to serve as primary counsel or financial consultant for the estate.

The primary objection to Skadden's employment is that it previously represented, and still represents, the holders of a large percentage of the equity of the Debtor, the holders of much of the prepetition and postpetition secured debt of the Debtor, and some of the holders of unsecured claims against the Debtor. A second objection is that Skadden received a prepetition preferential transfer (11 U.S.C. §547) from the Debtor. And the UST argues that this is not a case that justifies rates as high as the Debtor proposes to pay Skadden. Skadden responds in summary that it has not represented and is not representing any of the claims holders on any matter having to do with this case, that it is willing to give the estate a postpetition credit for the amount of the alleged preference, and that the proposed rates are in line with what it and other firms are charging in other jurisdictions and

that these rates are what the Debtor was paying prior to the filing of the petition.  The objections and responses are discussed in more detail below.

In making this decision, the Court has reviewed the Skadden application, the three supporting declarations by Richard Levin, the supporting declarations by Mr. Mortensen and Mr. Jacobvitz respectively, and the objections and supplemental objections, and the PwC application, the three supporting declarations by Loretta Cross, the objection and supplemental objection thereto, and all the briefs.  The Court has also reviewed its chamber's notes of the hearing testimony and the voluminous exhibits submitted by the parties.

**<u>Discussion of the Skadden Employment</u>**

The question is whether Skadden's employment meets the requirements of §327, which incorporates §101(14):[6]

Section 327(a) requires that professionals employed by the Debtor as debtor in possession "not hold or represent an interest adverse to the estate" and that they be "disinterested persons".

---

[6] Section 1107(b) provides that notwithstanding section 327(a), "a person is not disqualified for employment under section 327...by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."  No one has argued that Skadden's prior representation of the Debtor is a disqualifying factor.

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 6 of 49

Section 101(14)(E) defines "disinterested person" in relevant part as a "person that – does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders...for any...reason."[7]

Section 327(c) provides that a person is not disqualified for employment under §327 "solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

The burden of establishing that Skadden is not disqualified falls on the Debtor. <u>Interwest Business Equipment, Inc. v. United States Trustee (In re Interwest Business Equipment, Inc.)</u>, 23 F.3d 311, 318 (10th Cir. 1994); <u>compare</u> <u>In re Kliegl Bros. Universal Electric Stage Lighting Co., Inc.</u>, 189 B.R. 874, 880 (Bankr. E.D.N.Y. 1995) (burden is on objecting creditor or UST to prove a conflict of interest under §327(c)). And a showing that Skadden is not disqualified from representing the Debtor by virtue of §327(c)

---

[7] No one has argued that any of the other subdivisions of §101(14) apply to Skadden, although the Court has determined that Skadden's waiver of any prepetition claims against the estate removes it from the category of being a "creditor" in violation of §101(14)(A). See below at 8-9.

Page 6 of 46

is by itself not sufficient to show that Skadden is not

disqualified under §327(a).  <u>Interwest</u>, 23 F.3d at 316.

> The requirements of subsection (a) are threshold
> requirements to be met even if subsection (c) is
> implicated.  Subsection (c) addresses the situation
> where dual representation of the trustee and a
> creditor is the sole reason advanced for
> disqualification and the professional is otherwise
> qualified;...

<u>Winship v. Cook (In re Cook)</u>, 223 B.R. 782, 790 (10th Cir.

B.A.P. 1998).

### 1.  **Potential Preferential Transfer**

In December 2000, Skadden represented the Debtor in

securing additional financing from a group of secured lenders.

On December 29, 2000, Skadden invoiced the Debtor in the

amount of $230,000 for most of the work done.  The Debtor paid

$100,000 on that bill on January 9, 2001.  On February 2, the

Debtor wire-transferred to Skadden $250,000, comprised of the

remaining $130,000 plus $120,000.  The latter sum was intended

as a retainer to pay Skadden to prepare a chapter 11 filing

for the Debtor on an emergency basis. No one disputes that the

$120,000 was completely used up by the date of the filing on

February 8; in fact, the evidence is undisputed that the value

of the time and expenses incurred February 2 - 7 in preparing

the filing equaled at least $189,000.  The question is whether

some or all of the $130,000 portion of the February 2, 2001

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 8 of 49

payment constituted a preferential transfer, and if so, whether any of the defenses of §547(c) precluded the need for Skadden to return some or all of the $130,000 to the estate. Although Skadden argued in its Reply Brief that the $130,000 was paid within the ordinary course of business as permitted by §547(c)(2), it also tendered a postpetition credit to the estate of $61,000.[8] Reply Brief at 10. (Doc. 382) At the hearing, Mr. Levin also testified not only that Skadden would credit the $61,000, but also that Skadden would credit the full $130,000 if required to do so. The Court has taken these offers to mean that Skadden would not assert any claim against the estate for the amount of the funds credited.[9]

_____

[8] $250,000 (February 2 wire transfer) - $189,000 (February 2 - 7 cost of filing preparation) = $61,000. This figure is approximate, and in fact at a hearing on April 30, 2001 Skadden informed the Court, the UCC and the UST that there were some relatively minor additional charges for time and expenditures incurred during the six-day preparation period which should be added to the approximate $189,000 figure, thereby reducing the approximate $61,000 credit to the estate. Nothing in this decision is intended to preclude Skadden from proving up the additional charges, or the UST or the UCC from contesting any of the $189,000+ worth of charges or otherwise examining the Debtor's transactions with its attorneys as permitted by §329.

[9] Skadden also wrote off about $187,000 of other prepetition bills owed by the Debtor, plus additional amounts from the December refinancing work that did not make it into the December 29, 2000 invoice.

At the hearing, Mr. Levin testified, under cross examination from UCC counsel, that the $130,000 constituted a payment on the antecedent debt invoiced December 29, and that the payment met other requirements of §547(b).  However, he refused to concede that the $130,000 was a preferential transfer.  And, as noted above, Skadden argues that the $189,000 incurred February 2 - 7 constituted "new value" as provided by §547(c)(4).  The Court is therefore satisfied that Mr. Levin's testimony on April 20 did not constitute a concession by Skadden that the entire $130,000 was a preferential transfer which must be returned or credited in its entirety.

The Court does conclude, however, that Skadden should credit the estate for $61,000 on its postpetition billing, as it has offered to do.  Doing so will in effect treat the entire $250,000 February 2 wire transfer as a retainer for the prepetition preparation and a retainer for postpetition services, a permissible procedure.[10]  More important, it will remove even the suggestion that Skadden has a prepetition claim against the estate which would make it adverse to the estate.  United States Trustee v. First Jersey Securities,

_____

[10] At the April 30 hearing, Skadden offered to treat the entire $250,000 received on February 2, 2001 as a retainer for work to be done for the Debtor from February 2 forward.

Inc. (In re First Jersey Securities, Inc.), 180 F.3d 504, 509, 512 (3rd Cir. 1999) (preferential transfer constitutes actual conflict of interest mandating disqualification unless payment is made in the ordinary course of business); In re Roberts, 46 B.R. 815, 849 (Bankr. D. Ut. 1985), aff'd in relevant part and rev'd and remanded in part on other grounds, 75 B.R. 402 (D. Utah 1987)(law firm that is owed fees on petition date for work not done in contemplation of bankruptcy filing has interest adverse to estate); see, e.g., Sholer v. Bank of Albuquerque (In re Gallegos), 68 B.R. 584, 586 (Bankr. D.N.M. 1986) (attorney for debtor in possession who held claim against estate secured by lien on estate's liquor license had an interest adverse to the estate within the meaning of §327). By so ruling, the Court is effectively adjudicating the preferential transfer dispute without analyzing whether Skadden's ordinary course of business defense is valid, thereby resolving also the question of whether it is appropriate or even possible, under §327, to simultaneously represent the estate while engaging in a dispute about whether a preferential transfer had occurred. In other words, Skadden's tender of the $61,000 postpetition credit means that the Court does not have to analyze the procedure of those cases which appear to combine preferential transfer and

employment litigation in one adjudication.  See, e.g. First Jersey Securities, Inc., 180 F.3d at 512-14.[11]

As noted above, Section 327(a) requires in part that professionals employed by the Debtor as debtor in possession "not hold or represent an interest adverse to the estate". With the waiver of any prepetition claim against the estate and the treatment of the $61,000 as a retainer for postpetition billings to the estate, Skadden does not "hold... an interest adverse to the estate" nor, as required by §101(14)(A) and (E) respectively, is it a creditor of the estate or "have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders...."  See In re BH&P, Inc., 949 F.2d 1300, 1310 and n. 12 (3rd Cir. 1991); Bank Brussells Lambert v. Coan (In re Arochem Corporation), 176 F.3d 610, 628-30 (2nd Cir. 1999) (citing BH&P).[12]

_____

[11] Of course, there is inevitably some adjudication of the preferential transfer issue inherent in any employment decision.  Even in a case when there has been no transfer, the mere fact that a court assures itself that there has been no transfer constitutes a determination of the issue.

[12] This Court agrees with the opinion of the First Circuit in In re Martin, 817 F.2d 175 (1st Cir. 1987) that the requirements of §327(a) that counsel (1) not "hold...an interest adverse to the estate" and (2) "not have an interest materially adverse to the interest of the estate...." (by virtue of the incorporation of §101(14)(E)) appear somewhat redundant.  Id., at 179 and n. 4.  The inclusion in

**2.** **<u>Representation of Parties with Interests Adverse to the</u>**
**<u>Estate</u>**

In this case the more difficult question arises from the
relationship Skadden has with other parties in the case.
Skadden finds itself as Debtor's chapter 11 counsel across the
table from a number of parties whom it represents in other
matters and who are equity holders and creditors of the
estate. Mr. Levin testified without contradiction that
Skadden has not ever represented any of the equity holders or
creditors with respect to any matters related to the Debtor,
other than having represented the various Windward entities
("Windward Entities")[13] in 1995 when those entities purchased
equity in the Debtor. A summary of the relationships between
Skadden and the various parties is as follows, based in good

---

§101(14)(E) of creditors or equity security holders in
addition to the estate is at least one distinguishing feature
between the two sections which makes for imbrication rather
than redundancy.

[13] These entities are Windward/Park FSI, LLC; Windward
Merchant, LP; Windward Northwest, LP; Windward Merban, LP; and
Windward Capital Associates, LP.

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 13 of 49

part on the First Supplemental Declaration[14] of Richard Levin

relied on heavily by the UCC in its arguments:

A.   The Windward Entities hold about 60% of the Debtor's

     equity.  In 1995 Skadden represented the Windward

     Entities in their acquisition of a part ownership of the

     Debtor; from that point forward Skadden has represented

     the Debtor and not the Windward Entities in the Debtor's

     transactions with the Windward Entities.  Skadden

     continues to represent the Windward Entities in

     "corporate transactions" other than those having to do

     with the Debtor.  The Windward Entities were billed about

     0.07% of the total fees billed in CY 2000 by Skadden.  The

_____

[14] The UCC spends part of its supplemental objection
alleging that the Debtor's "stonewalling", intentional or
otherwise, has deprived the Committee of the ability to
perform its functions.  Doc. 367.  The implication of the
complaint, given its context, must be that there has been a
lack of disclosure, and that the lack of disclosure evidences
Skadden's lack of disinterestedness.  UCC Supplemental
Objection, at 8-9.  Without ruling on the allegation, at the
April 20 hearing the Court reiterated its position that the
parties share documents and information freely, and that in
the event of a dispute, the Court is available on short notice
to resolve disputes (which will usually be by reference to the
foregoing principle) so that lack of information need not and
should not be the basis for any argument.  Between the three
declarations filed by Mr. Levin, his testimony and the
exhibits admitted at the evidentiary hearing on April 20, and
his statement at the May 8 hearing, the Court finds that there
has been no failure or shortage of disclosure on Skadden's
part, particularly when the rushed circumstances of the
chapter 11 filing are taken into account.  The UST does not
argue that there has been insufficient disclosure.

Windward Entities also received payments, as insider shareholders, of approximately $257,000 in the year preceding the filing of the petition.

B.  Credit Suisse First Boston ("CSFB") holds about 21% of the Debtor's equity directly and, through the Windward Entities, 18% indirectly. CSFB also holds $8.7 million in secured claims.  Skadden continues to represent CSFB in "corporate transactions".  CSFB was billed about 2.15% of the total fees billed in CY 2000 by Skadden.

C.  MetLife holds the beneficial ownership of 53% of the stock and 55% of the warrants issued in the Debtor, indirectly through one of the Windward Entities.  MetLife holds $37.4 million in secured claims and $32.8 million in an unsecured claim, and also holds a portion of the $33 million in postpetition financing advanced to the Debtor pursuant to a final order entered on March 14, 2001 ("DIP Financing Order").  Doc. 241.  Skadden continues to represent MetLife in "litigation", which is in large part defending MetLife in asbestos-related litigation.  MetLife was billed about 2.57% of the total fees billed in CY 2000 by Skadden.

D.   Heller Financial, Inc. ("Heller") is acting as agent for the prepetition and post petition secured lenders MetLife, Bank of America Group, Fleet Financial Group and itself.  Heller holds a prepetition secured claim of $17.7 million and a portion of the $33 million in postpetition financing provided by the DIP Financing Order.  Skadden continues to represent Heller in "tax matters, litigation and corporate transactions".  Heller was billed about 0.08% of the total fees billed in CY 2000 by Skadden.

E.   Bank of America holds a prepetition secured claim of $17.7 million and a portion of the $33 million in postpetition financing provided by the DIP Financing Order.   Skadden continues to represent Bank of America, N.A. and Bank of America Corp. in "tax matters and corporate transactions".  These two Bank of America entities were billed about 0.09% of the total fees billed in CY 2000 by Skadden.  In addition, Skadden attorneys hold something less than 14,000 shares of stock in Bank of America stock, mostly held in "blind" brokerage accounts that the attorneys do not control.  As of March 7, 2001, there were over 1.6 billion shares of Bank of America common stock outstanding.

F.   Fleet Financial Group holds a prepetition secured claim of $14.2 million and a portion of the $33 million in postpetition financing provided by the DIP Financing Order.   Skadden continues to represent Fleet Financial Group in "corporate transactions".   Fleet Financial Group was billed about 0.01% of the total fees billed in CY 2000 by Skadden.

G.   McDonnell Douglas Finance holds a prepetition secured claim of $8.5 million.   Skadden continues to represent McDonnell Douglas Finance in "litigation and corporate transactions".   No evidence was presented about what percentage McDonnell Douglas Finance was billed of the total fees billed in CY 2000 by Skadden.

H.   Finova Capital Corporation holds a prepetition secured claim of $4.6 million.   Skadden continues to represent Finova in "tax matters and corporate transactions".   Finova was billed about 0.0008% of the total fees billed in CY 2000 by Skadden.

I.   Compaq Financial Corporation holds a prepetition secured claim of $345,392.   Compaq Financial Corporation or its affiliates were billed about 1.2% of the total fees billed in CY 2000 by Skadden.

J.   CIT Equipment Financing holds a prepetition equipment
     lease.  CIT Equipment Financing or its affiliates were
     billed for nothing in CY 2000 by Skadden.

K.   Chattem, Inc. holds an unsecured claim of $50,896.
     Chattem, Inc. was billed about 0.01% of the total fees
     billed in CY 2000 by Skadden.

L.   Skadden also represents a number of the trade creditors
     in litigation, tax matters and/or corporate transactions,
     and in two instances respectively, political law advice
     and bankruptcy matters.  These creditors each hold
     relatively small unsecured claims in this case, except
     for Pepsi Cola Co., and are identified as follows:
     Campbell Soup Company, Coca-Cola Enterprises, Crystal
     Springs Bottled Water, Inc., The Earthgrains Company,
     Frito Lay, Inc., Kimberly Clark Corp., Mars Incorporated,
     Nabisco Holdings Corp., Pepsi Cola Co., Pharmacia
     Corporation, The Pillsbury Company, Sara Lee Corporation,
     Vlasic Foods International, Inc., Waste Management of New
     Mexico, and Mission Foods.

Additional facts raised by the parties are recited below where
relevant for the discussion.

     The UST's objections, summarized in her Supplemental
Objection to Employment Applications of Skadden, Arps, Slate,

Meagher & Flom, LLP (doc. 370), essentially are that Skadden
has too many and too significant connections with the secured
creditors and the majority shareholders, particularly the
Windward Entities, to allow it to serve.  The UST also argues
that the Debtor's approval of the interim and final DIP
Financing Order, in which the Debtor agreed not to contest the
validity of the secured lenders prepetition liens as a
condition for obtaining the postpetition financing in itself
created a conflict (rather than, apparently, merely
demonstrating the conflict), and that the prepetition payments
received by Windward put Skadden in a conflict position of
having to review those payments on behalf of the Debtor.  The
UST argues that all of Skadden's relationships, taken
together, rise to the level of an actual conflict, thus
precluding Skadden's employment.  The UCC also argues that
Skadden's relationship with the secured lenders and the equity
holders is so pervasive that an actual conflict exists, giving
this Court no discretion on whether to disqualify Skadden.

Skadden asserts first that it has never represented any
of the parties, including any secured lender or equity holder,
in connection with any transaction with the Debtor, with the
single exception of the Windward Entities purchase of a
portion of the Debtor's equity in 1995.  No one has contested

this assertion, nor has anyone argued that the 1995 transaction has any material bearing on this issue.

More important, Skadden asserts, in part through the sworn testimony of Mr. Levin, that Skadden's restructuring group often faces the question of where its loyalty might lie in circumstances such as these. Mr. Levin stated that Skadden makes clear to its clients that the restructuring group does not "hold back", that the group is "zealous" in representing its client, and that the firm's reputation would be at stake if the restructuring group acted otherwise. The Court observed the demeanor of Mr. Levin during this answer and throughout his testimony, and has weighed all of his testimony, including the three declarations that he executed and swore to as part of the evidentiary presentation on April 20. The Court finds Mr. Levin's testimony credible. And the Court explicitly finds that Skadden has represented and will continue to represent the Debtor vigorously and formidably, and without pause or hesitation.

In making this decision, the Court's duty is to ensure compliance with the Code, thereby protecting the interests of the estate (including the interests of the creditors). The Court also has a duty to police the practice of law as that practice occurs before the Court, which would include not

permitting violations of the applicable rules of professional conduct. The Court is comfortable both that the interests of the estate are well protected and that no ethical violations result from Skadden's representation of the Debtor.

As noted above, §327(a) directly and by reference to §101(14)(E) precludes the employment of counsel who have or hold an interest "adverse" to the estate or its creditors or equity holders. The Code does not define "adverse interest" as such. E.g., In re Amdura Corporation, 121 B.R. 862, 864 (Bankr. D. Co. 1990). A commonly cited definition of to "hold an interest adverse to the estate" is

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

In re Roberts, 46 B.R. at 827.

Courts have usually analyzed the "adverse interest" test in terms or concepts they are familiar with; that is, in terms of conflicts of interest. 3 Collier on Bankruptcy (15th Ed. Rev. 2000), ¶327.04[3], at page 327-30. In this context, the Court must examine the circumstances of each case in making an employment decision.

> Because the few absolute disqualifications Congress has established are carefully delineated and

> narrowly tailored, the court must take care not to
> fashion absolute prohibitions beyond those
> legislatively mandated without some measure of
> assurance that the purposes of the Bankruptcy Code
> always will be served thereby. ...[T]he court...must
> not abdicate the equitable discretion granted to it
> by establishing rules of broad application which
> fail to take into account the facts of a particular
> case and the overall objectives of the bankruptcy
> system.

Harold & Williams Development Company v. United States Trustee

(In re Harold & Williams Development Company), 977 F.2d 906,

909 -10 (4th Cir. 1992) (Italics, citations and footnotes

omitted.) "This inquiry is of necessity case-specific." In

re Martin, 817 F.2d at 182. Since the "carefully tailored and

narrowly delineated" provisions of §327(a) explicitly preclude

a professional from representing the estate if the

professional holds an interest adverse to the estate, "§327(a)

mandates disqualification when there is an actual conflict of

interest, allows for it when there is a potential conflict,

and precludes it based solely on an appearance of conflict."

In re First Jersey Securities, Inc., 180 F.3d at 509,

summarizing the Third Circuit's earlier holding in In re

Marvel Entertainment Group, Inc., 140 F.3d 463, 476 (3rd Cir.

1998).

The mere appearance of conflict is by itself insufficient

to disqualify counsel. Id. See In re BH&P Inc., 949 F.2d at

1310 (dealing with §324 and removal of trustee). The New

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 22 of 49

Mexico Rules of Professional Conduct no longer include an "appearance of impropriety" standard.[15] Cases such as <u>In re Kendavis Industries International, Inc.</u>, 91 B.R. 742, 753 (Bankr. N.D. Tx. 1988) (fees for counsel for debtor in possession reduced because of conflicts of interest, failure to disclose and rendering services of questionable benefit to estate) rely on the "appearance of impropriety" standard. <u>Accord</u>, <u>In re Martin</u>, 817 F.2d at 180-81; <u>Rome v. Braunstein</u>, 19 F.3d 54, 58 (1st Cir. 1994) (citing <u>In re Martin</u>). Since <u>Kendavis Industries</u> and <u>Martin</u> were decided, the American Bar Association standards of ethical conduct deleted the appearance of impropriety standard. <u>See</u> note 15; <u>see also</u> <u>In re Roberts</u>, 46 B.R. at 836. As noted above, New Mexico has adopted the Rules of Professional Conduct.

In <u>Winship v. Cook (In re Cook)</u>, 223 B.R. 782 (10th Cir. B.A.P. 1998), the Bankruptcy Appellate Panel for the Tenth

---

[15] Pursuant to New Mexico Supreme Court order dated June 25, 1986, the Rules of Professional Conduct, based on the American Bar Association's Model Rules, became effective January 1, 1987. <u>See</u> Compiler's notes to Table of Contents, Rules of Professional Conduct, NMRA Volume 2. "The Model Rules take a much narrower view of a conflict of interest than does the Model Code. The new ABA formulation abandoned the appearance of impropriety concept of Canon Nine as an unworkable standard and replaced Canons Four and Five with Model Rules 1.6, 1.7, and 1.9." R. Craig Smith, <u>Conflicts of Interest under the Bankruptcy Code</u>, 8 Geo.J. Legal Ethics 1045, 1055 (1995)(hereafter Smith, <u>Conflicts of Interest</u>.)

Page 22 of 46

Circuit stated that the appearance of impropriety was an independent ground for disqualification under §327(c). Id., at 789, citing as authority 1 Collier on Bankruptcy ¶327.04[7][b] (Lawrence P. King ed., 15th ed. rev. 1998). Collier in turn cites In re American Printers & Lithographers, Inc., 148 B.R. 862, 863, 865-66 (Bankr. N.D. Ill. 1992). Although the American Printers court cited to In re Martin, 817 F.2d at 181, American Printers was resolved on the basis of an actual conflict of interest: the proposed counsel for the debtor also represented the estate's primary creditor which provided 10% of the law firm's revenues. In addition, Cook did not originate in New Mexico, which has no "appearance of impropriety" standard.

Notwithstanding the foregoing, the Court is not ruling categorically that appearances count for nothing. As Circuit Judge Friendly stated, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right", quoted in In re Leslie Fay Companies, Inc., 175 B.R. 525, 536 (Bankr. S.D. N.Y. 1994) (citations omitted). At the same time, the Court must insure that the accusations of conflict of interest do not in themselves become self-fulfilling prophecies. Where to draw the line between not disqualifying a firm for the mere "appearance of impropriety" and

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 24 of 49

disqualifying a firm because the employment of that firm will materially damage the bankruptcy process can only be determined on a case-by-case basis. In this instance, however, the UST's allegations of harm to the estate remain unproven. In consequence, the UST's argument in closing – that Skadden's relationship to other parties will lead creditors to question whether the DIP Financing Order should have been entered into – is not persuasive.

Some courts have rejected the distinction between actual conflicts and potential conflicts. E.g., In re Ginco, Inc., 105 B.R. 620, 621 (D. Colo. 1988). "The concept of potential conflicts is a contradiction in terms. Once there is a conflict, it is actual – not potential." In re Kendavis Industries International, Inc., 91 B.R. at 754 (emphasis in original); see generally id. at 753-56. And see also In re Wm. J. O'Connor, 52 B.R. 892, 897 (Bankr. W.D. Ok. 1985), that speaks of "potential actual conflicts". As the facts in this case demonstrate, the distinction between "actual" and "potential" conflicts can be quite subtle.

Other courts disagree with the "absolutist" position of cases such as Kendavis Industries, arguing among other points that failure to distinguish between "actual" and "potential" conflicts constitutes a "per se" rule that results in the

Case 01-10779-sh7   Doc 679   Filed 06/27/01   Entered 06/28/01 09:44:00 Page 25 of 49

court abdicating its responsibility to fully consider the facts presented and make an informed decision.  In re BH&P Inc., 949 F.2d at 1316-17, cited in In re Interwest Business Equipment, 23 F.3d at 315; In re American Printers & Lithographers, Inc., 148 B.R. at 865.[16]  In any event an examination of cases such as Kendavis Industries shows an analysis that ultimately found very real conflicts of interest that were not remote or "potential".  In short, as pointed out in In re Leslie Fay Companies, Inc., 175 B.R. at 532, virtually every court, even those that discount the difference between actual and potential conflicts, has done a fact-specific inquiry to determine whether the professional in question held an interest adverse to the estate.  E.g., In re Amdura Corporation, 121 B.R. at 866.  Those that have not

---

[16]  What is apparent is that the courts are talking about a spectrum of interests, ranging from conflicting interests that are so immediate or demanding that they cry out for disqualification, to the "conflict" that is non-existent or so remote that it does not present a concern.  In every case the court has to find where to draw the line.  In other words, the choices in characterization of conflicts are often not black and white but rather varying shades of gray.  See Sonderby and McGuire, Gray Area in the Law? Recent Developments Relating to Conflicts of Interest and the Retention of Attorneys in Bankruptcy Cases, 105 Com. L.J. 237 (Fall 2000).  Nevertheless, because the courts speak in terms of "actual" and "potential" conflicts, e.g., In re First Jersey Securities, Inc., 180 F.3d at 509, and §327(c) even uses the term "actual conflict", this Court will use the same terminology.

Page 25 of 46

conducted such an inquiry have been reversed.  E.g., In re
Harold & Williams Development Company, 977 F.2d at 910-11.

The Court finds that Skadden does not have any actual
conflict of interest in representing the estate.  None of its
attorneys are representing any party in a matter that is
adverse to, or has any connection with, the Debtor or the
estate, other than the representation of the debtor in
possession in this case.

Both the UST and the UCC argue that the total amount of
the 2000 billings represented by the clients of Skadden,
4.93%, make Skadden's conflict with the estate a real one,
citing In re Amdura Corporation, 121 B.R. 862 and  In re
American Printers & Lithographers, Inc., 148 B.R. 862.  (In
fact, the total billings to Skadden clients were no less than
6.1008% in CY2000 and almost certainly higher.  See pages 12-
16 above.)  In Amdura, the court disqualified counsel who
conceded that he could not "bite the hand that feeds" his
firm.  And in American Printers, the court disqualified
counsel because counsel's firm derived 10% of its gross annual
revenues from LaSalle National Bank, which was the debtor's
largest creditor and its source of post petition financing.

Neither those facts (the percentages of billings) nor the
cited cases require the disqualification of the firm.  To

begin with, consistent with cases such as <u>In re BH&P Inc.</u>, 949
F.2d at 1316-17, <u>In re Harold & Williams Development Company</u>,
977 F.2d at 909-10 and <u>In re Martin</u>, 817 F.2d at 182, <u>Amdura</u>
and <u>American Printers</u> do not set out per se tests for
disqualification.  Each of those courts examined the specific
facts presented to them and made the decision.
(Appropriately, the UCC and the UST do not argue otherwise.)
Examining the details of this case, the 6.1% represents the
billings for over half a dozen of Skadden's clients.  To
measure the impact of the representation, it is more
appropriate to break down the numbers by each client
individually, since there is no reason to think that there is
anything Skadden would or could do in this case to make all of
them act as one in making a decision about whether to continue
to have Skadden represent them in the other matters.[17]
Further, with respect to the various individual creditors
represented by Skadden, many appear to have Skadden performing
work that is not likely (although it could be) connected with
the bankruptcy restructuring group, work that includes tax
matters, corporate transactions, litigation and, in one case,

---

[17]  That is why it is not that important to know what are
the individual percentages of CY2000 billings represented by
Campbell Soup Company et al.  No one has suggested that those
percentages are anywhere near the size of MetLife's or CSFB's
billings.

political law advice.  The evidence is that over 1,000 attorneys work at Skadden and while there is no question that the imputed disqualification rule is applicable (see <u>below</u> at pages 30-31), the scope of services provided by Skadden and the multiple personnel that provide those services practically speaking make it less likely that the personnel in the bankruptcy restructuring group would be tempted to temporize.

Using the guideline of considering the creditors individually, the largest creditor in terms of CY2000 billing is MetLife at 2.53%, followed closely by CSFB at 2.15%. Neither of those numbers in themselves are so large that they lead this Court to conclude that Skadden's efforts on behalf of the estate are in danger of compromise.  It is true, as pointed out in <u>In re Leslie Fay Companies</u>, 175 B.R. at 535, that a firm should be presumed to loyal to a client.  "That the client may not be a major client is no reason to think that Weil Gotshal would ignore the relationship." <u>Id.</u>  As the respondents point out, even a small percentage of a firm's gross revenues may represent for a few attorneys a very important part of the revenue they bring into the firm and therefore a very important part of their personal income.  A related aspect, or perhaps merely an illustration, of the situation is Mr. Levin's disclosure that he is currently

working for CSFB on an unrelated bankruptcy restructuring

matter.[18]

Even given all the foregoing, however, the Court finds

that another statement of the Leslie Fay Companies court is

more applicable in this case:

> Rather than worry about the potential/actual
> dichotomy it is more productive to ask whether a
> professional has 'either a meaningful incentive to
> act contrary to the best interests of the estate and
> its sundry creditors – an incentive sufficient to
> place those parties at more than acceptable risk –
> or the reasonable perception of one.'

In re Leslie Fay Companies, 175 B.R. at 532, citing In re

Martin, 817 F.2d at 180-81. Given the role that the Skadden

bankruptcy restructuring group plays for its clients, as

testified to by Mr. Levin, the Court has concluded that there

is not a meaningful incentive to act contrary to the best

interests of the estate and its creditors. Indeed, acting

---

[18] This disclosure came in connection with a hearing
conducted by the Court at the request of the Debtor in
response to a partial "letter ruling" issued by this Court on
May 4, 2001 (doc. 411). The hearing began on May 8 and
finished on May 9, the minutes of which are docs. 431 and 438
respectively. Attached to the May 9 minutes are the Court's
notes for a portion of the hearing on May 9, dealing with the
reconsideration and "withdrawal" of the May 4 letter. Note:
the text attached to the May 9 minutes is not the official
record of the proceedings; the official record is of course
the verbatim transcript taken by the court reporter. The text
attached to the minute sheet is comprised of the notes
prepared and used by the Court in announcing its decision, and
has been put into the record for the convenience of readers of
the file.

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 30 of 49

aggressively on behalf of each of its restructuring group
clients in each (unrelated) case aligns the interests of the
client - in this case, the debtor in possession - and the
firm's restructuring group, in part because it presumably
enhances the restructuring group's reputation and thus leads
to more business.  Further, to rule that the fact, standing
alone, that Skadden represents other parties in unrelated
matters requires Skadden's disqualification in this case,
would be to make a per se rule about professionals and
unrelated matters that is not required by the Code and in fact
departs from it.  E.g., In re BH&P Inc., 949 F.2d at 1316-17,
In re Harold & Williams Development Company, 977 F.2d at 909-
10 and In re Martin, 817 F.2d at 182.  That is particularly
true in light of the evidence presented in this case.  And it
is also true regardless of the percentages of Skadden's
billings represented by each of the parties in question; that
is, a professional should be disqualified only if a fact-
specific inquiry, such as occurred in In re Envirodyne
Industries, Inc., 150 B.R. 1008, 1018-19 (Bankr. N.D. Il.
1993), In re Amdura Corporation, 121 B.R. at 867, and In re
American Printers & Lithographers, Inc., 148 B.R. at 863-65,
leads to the conclusion that the client's importance to the

Case 01-10779-sh7   Doc 679   Filed 06/27/01   Entered 06/28/01 09:44:00 Page 31 of 49

professional is such that the professional will have an incentive to act contrary to the interests of the estate.

To some extent, courts have made disqualification decisions based on assumptions about the behavior of the professionals in question.  For example, the court in In re Envirodyne Industries, Inc., 150 B.R. at 1019 found that where a "substantial client" of the firm was an insider, an owner and a "substantial creditor" of the debtor, the firm could not represent the debtor, despite the firm's protestations to the contrary.[19]  See also  In re American Printers & Lithographers, Inc., 148 B.R. at 865-66 ("SCK&G may not be able to do this without jeopardizing its relationship with its large and very important client LaSalle.  Therefore, an actual conflict exists, and disqualification of SCK&G is required under the circumstances.")  Compare In re Amdura Corporation, 121 B.R. at 867 (counsel admitted that lead lender of debtor was "the hand that feeds" the firm).  In this instance, the Court has made its decision less in reliance on assumptions of how Skadden (or other firms) would treat its clients and more on the basis of the evidence.  This approach is consistent with not setting down bright-line tests for disqualification, and

_____

[19] The Envirodyne court also found specific facts that showed the firm's bias in favor of the creditor.  Id., at 1019.

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 32 of 49

with not disqualifying counsel based solely on appearances.
In doing so, the Court is not suggesting that Envirodyne
Industries and American Printers & Lithographers were wrongly
decided. Rather, the Court, which would probably have decided
those cases the same way, has been able to make the decision
in this case without the use of as many assumptions as those
courts relied on.

A consequence of the ruling is that Skadden is not
precluded from negotiating or litigating directly with any
creditor (including, for example, MetLife) or any other party
about the party's claims or interests, the treatment of those
claims or interests in any plan that Skadden may develop and
file for the Debtor, or any other issue. Nor does it need to
have its co-counsel, Jacobvitz Thuma & Walker, conduct
preference screens or take on any other specific role. While
this ruling permits Debtor's counsel to share the
responsibilities for the Debtor's representation as counsel
have anticipated it (Skadden to perform the more strategic
duties and the Jacobvitz firm to perform many of the other
tasks), that is not the purpose of this ruling, but merely an
outcome of it.[20]

---

[20] Of course, Skadden may decline voluntarily to negotiate
or litigate with a party for business or perhaps other
reasons. If that occurs, and the Debtor needs to have some

Skadden also submitted waivers that it had obtained from various clients who are also secured creditors in this case, such as MetLife. These waivers would be insufficient to cure noncompliance with §327, since the language of that section does not contain such an exception to its requirements for professionals. See In re American Printers & Lithographers, Inc., 148 B.R. at 867; In re Amdura Corporation, 121 B.R. at 866; Smith, Conflicts of Interest, 8 Geo.J. Legal Ethics at 1051. However, they may well be useful to comply with the state rules of professional responsibility, see, e.g., id.; In re Envirodyne Industries, Inc., 150 B.R. at 1015 (local rules of professional responsibility are relevant to the §327 determination), specifically Rules 16-107 and 16-110 of the New Mexico Rules of Professional Conduct as those rules may be applicable.[21]

---

other party conduct the negotiation or litigation, the net extra cost to the estate, if any, can be dealt with at a fee application hearing and deducted from Skadden's compensation.

[21] Two reasons counsel this approach: attorneys are bound by the rules of the state in which they practice, regardless of what type of law they practice, and the substantive concepts that make up the rules of ethical conduct are drawn in large part from state law, even though they are applied in the bankruptcy context. Goldstein, Retention of Counsel: Ethical Issues and Special Considerations in Bankruptcy Cases, SE71 ALI-ABA 237, 239-240 (2000).

The UST argues that the Debtor's agreement, in approving the DIP financing orders, not to contest the "validity, perfection, priority, enforceability, and non-avoidability" of the secured lenders prepetition liens as a condition for obtaining the postpetition financing in itself created a conflict of interest. And the UCC questioning of Mr. Levin raised the argument that the Debtor had failed to sufficiently examine the lenders' security interests in the negotiation of the DIP financing orders. The response to those arguments is three-fold: first, it is routine (based on this Court's experience and knowledge) for prepetition lenders to insist, as a condition for post petition lending, that the debtor not contest the perfected status of the prepetition security interests or any other aspect of the prepetition lending. In this respect, the Debtor, having financially exsanguinated by the time of the filing of the petition, had no choice but to accept that condition of the post petition lending. To have insisted otherwise would have left the Debtor with nothing to reorganize; it was a situation of "waive or close".

Second, Mr. Levin testified that in December there had been a refinancing, at which time the Debtor had executed a series of documents acknowledging the validity of the senior secured position of the lenders, and that while he could not

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 35 of 49

say that he had personal knowledge of who on the Skadden team in the week before the filing had reviewed those agreements, it was highly unlikely that anything had changed significantly since December. Third, the DIP financing orders permit those matters to be raised by the Committee anyway, so that the estate is left with virtually the identical rights that it would have had had it not agreed to those provisions in the DIP financing order.

Thus, the Committee's argument that in effect Skadden failed to represent the estate adequately, and the UST's argument that Skadden's action in not contesting the validity of the liens constituted in itself a conflict of interest, are more speculation than reality. The Committee's argument in particular is comprised mostly of speculation and imaginative Monday-morning quarterbacking engaged in long after the funding crisis on the petition date has passed. And the UST's argument that the terms of the financing order themselves demonstrate an actual conflict leaps to a conclusion based on innuendo rather than evidence. "[I]nterests are not adverse because it is possible to conceive a set of circumstances under which they might clash." In re Leslie Fay Companies, Inc., 175 B.R. at 532; see also In re Martin, 817 F.2d at 183 ("[H]orrible imaginings alone cannot be allowed to carry the

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00    Page 36 of 49

day.").  Neither argument acknowledges the reality of the world of post petition debtor financing.

The UST also argues that the prepetition payments received by Windward put Skadden in a conflict position of having to review those payments on behalf of the Debtor.  Mr. Levin stated that this was a case where there was simply nothing for equity, so Windward's ownership interest was not a problem.  The fact that there is insufficient value in a company to provide any return to an equity owner does not of course prevent the owner from attempting to influence the outcome of a case, as is attested to by, for example, the continuous stream of cases wrestling with the absolute priority rule.  However, what the Court has ruled already with respect to the creditors in this case is applicable as well to the equity holders.  This Court has no reason to believe that Skadden will treat the equity holders any less aggressively than the creditors.

The UST also argues that Skadden's representation, in unrelated matters, of PricewaterhouseCoopers and Deloitte & Touche, LLP (the Committee's proposed financial adviser), coupled with Skadden's failure to object to the terms of employment of both those entities (the UST has since resolved its objections to the PwC application, except as to rates, and

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00    Page 37 of 49

as to the Deloitte & Touche application, constitute factors that, taken with the other facts in this case, require disqualification.  The Court finds that these facts, taken alone, do not constitute even part of a basis for disqualification.  As Mr. Levin pointed out, Skadden has no business opposing its client's choice of financial advisers, and the decision not to oppose the Committee's choice of a financial adviser should be encouraged, not criticized.

Nor do these facts taken altogether justify disqualification.  The UST argues that the disqualification decision rendered in In re Solv-Ex Corporation, No. 11-97-14361, Memorandum Opinion (Bankr. D. N.M. February 13, 1998)(doc. 274) is a useful precedent.  In that case, the court denied the application to employ the law firm chosen by the debtor in possession, finding that the law firm had an actual conflict of interest precluding it from serving.  Id. at 16.  The court in that case also found (and this is the point for which the UST particularly urges the case) that there were a number of potential conflicts which, taken together, constituted a sufficient basis for finding that the firm was not disinterested.

> Each of these facts, when looked at individually,
> are not in and of themselves reasons to disqualify a
> firm.  However, the facts in the present case, when
> taken together, lead the Court to the conclusion

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 38 of 49

that Hinkle, Cox is an interested party and is thus
disqualified from representing the Debtors.  In
weighing the Debtors' right to choose counsel as
well the fact that Hinkle, Cox has represented the
Debtors for years against the fact that Hinkle, Cox
has a lack of disinterestedness, the Court finds on
balance that the lack of disinterestedness outweighs
the other considerations.

Id. at 12-13.  This Court of course respects the reasoning and

insights contained in the Solv-Ex decision, but does not feel

that it is compelled to apply that methodology in every case,

including this case.[22]  Indeed, as the Solv-Ex court

acknowledged, "[C]ourts, in general, have declined to

formulate bright-line rules regarding the criteria for

disqualification, but instead have tended to favor an approach

which gives the bankruptcy court discretion to evaluate each

case on its facts, taking all circumstances into account."

Id., at 5.  (Citation omitted.)

There is certainly merit in the approach, in fact a

requirement, that the Court look at all the circumstances as a

whole in making a disqualification decision.  And it would be

simplistic and inaccurate to, so to speak, assign a value of 0

to potential conflicts and a value of 1 to actual conflicts,

so that all the potential conflicts in the world could never

_____

        [22] The Court also has not, in making this decision, felt
it necessary to engage in balancing the Debtor's right to
choose counsel with the dictates of §327(a).

add up to an actual conflict.[23]  Nevertheless the Court finds
that each alleged conflict should be analyzed on its own, at
least on the first round of examination, and if no individual
conflict presents a problem, then that conclusion would
suggest that the employment is appropriate.  That is because,
in a general sense, the mere fact that there is more than one
potential conflict, each of which taken alone is non-
disqualifying, should not instead result in disqualification
solely by dint of numbers.  The Court has analyzed each of the
alleged actual or potential conflicts, and for the reasons set
out above, concludes that the employment is proper.  And in
any event, even taking all the potential conflicts together,
the Court still finds that the employment is proper.  The
representation of other parties to this case – equity, secured
creditors and unsecured creditors – in matters unrelated to
this case, does not require disqualification in the absence of
some concrete indication that the estate's interests are
likely to be compromised.  And of course the fact that Skadden
may have received a preferential transfer which it has
successfully resolved adds nothing to the basis for
disqualification.

_____

[23] That would especially be the case if one views
conflicts as falling along a continuum from non-existent to
fully realized and material.  See note 16 above.

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 40 of 49

In light of the foregoing, the Court will approve the Debtor's employment of Skadden, without requiring the firm to erect any "ethical walls", contrary to portions of the letters issued by the Court on April 26 and May 4, 2001. The Court will also require Skadden to perform follow up conflict checks no less often than quarterly, although requiring only quarterly conflict checks is not intended to shift in any way the burden on Skadden (1) to continue to ensure that it has or represents no interest adverse to the estate and (2) to disclose immediately any such interest. See, e.g., Matter of XGW Excavating Co., Inc., 111 B.R. 469, 473 (Bankr. D.N.J. 1990).

## Discussion of rates for Skadden and PwC

Skadden has proposed two sets of maximum rates, which it makes available to all its clients. Skadden explains the two rate structures as follows:

> The firm's clients may choose between a traditional rate structure, under which the firm bills for various cost and disbursement items on an 'as used' basis, and the bundled rate structure, under which many of those costs are not charged.
> Hourly rates under the bundled rate structure are approximately seven percent higher than the hourly charges under the firm's traditional rate structure, but under the bundled rate structure Skadden, Arps does not bill separately for any of the following charges: outgoing faxes, overtime meals, transportation allowance (for late work), secretarial overtime, word processing or secretarial word processing services, proofreading, and record

Case 01-10779-sh7   Doc 679   Filed 06/27/01   Entered 06/28/01 09:44:00 Page 41 of 49

clerks and other miscellaneous support, such as file
clerks.  In addition, the firm's charge for internal
photocopying and other reproduction is reduced from
$.15 per page to $.10 per page.

It has long been the case in this jurisdiction that
certain costs are considered to be "overhead" and thus not
separately billable to the estate.  These include secretarial
work (overtime or not) and word processing (secretarial or
not).  Record and file clerks would ordinarily fit into this
same category.  And while the Court assumes that anyone filing
a document with the Court will have proofread it before
filing, that task, and thus the cost, would in any event be
included in the process of reviewing a document before filing.
It is also the case that a reasonable charge for outgoing
faxes and for photocopying is permitted.  $.15 per page is a
reasonable charge for photocopying.  Finally, overtime meals
and late work transportation allowances would also be
appropriately treated as part of overhead.

In consequence, the Court will allow Skadden to charge
its "unbundled" rates for attorneys and paralegals, plus
reasonable charges for outgoing faxes and $.15 per page for
photocopying, plus New Mexico gross receipts taxes as may be
applicable.  Those "unbundled" rates are 93% of the rates set

out on the attached Exhibit A[24], which is taken from the Initial Levin Declaration.  No rate increases shall be allowed except upon application to the Court.  Consistent with the standard practice in this jurisdiction, the Debtor is authorized to pay monthly to Skadden 75% of the fees billed each month and 100% of the costs, with 25% of the fees to be held back until further order of the Court.

Nothing in this decision approving the unbundled rate structure requires Skadden to bill at the maximum level, of course.  The Court has noted the contents of Appendix 4 attached to the Second Supplemental Levin Declaration, which shows that the rates at which Skadden is currently billing the services of various persons are less than the maximum sought in the Initial Levin Declaration.  (A copy of Appendix 4 is appended to this opinion.)  The Court is not limiting Skadden to the rates set out in Appendix 4, but of course to the extent that the actual rates charged by Skadden deviate downward from the authorized rates in the direction of the rates set out in Appendix 4, the more likely a fee application is to be approved.

---

[24] For purposes of calculating the rates for the associates for the Class of 2000, the "bundled" rate shall be $250.00 per hour, as noted on Exhibit A's footnote.

The rates as approved are less than what the Debtor has asked for (although higher than the rates argued for by the UST). The Court is aware of the Congressional policy embodied in the Code to compensate bankruptcy professionals comparably to non-bankruptcy work in order to ensure that bankruptcy cases received the same quality attention as other areas of law. On that basis, in part, the Debtor has asked to employ Skadden at its bundled rates, and the rates proposed are represented to be those that Skadden has been charging this Debtor for its prepetition representation and are generally consistent with rates charged by Skadden in other fields of law (see Exhibit A attached hereto). The Court has in effect reduced those rates somewhat, for two reasons. One is that, although this case is the largest and most complex that has been filed in this jurisdiction, it nevertheless is relatively small and less complex compared to many of the cases in which Skadden and the other national-level professionals have charged rates comparable to what is being requested in this case. In so ruling, the Court is not in any way ignoring the maxim that even the smallest case can present very complex problems. And certainly a continuous theme of the testimony in this case from professionals and non-professionals alike has been that this Debtor's financial circumstances make this

case a difficult one. Nevertheless, the fact that this
bankruptcy matter has only one debtor with 71 stores (at the
start of the case) and assets in only two states, and debts of
less than $300,000,000, suggests to the Court that a somewhat
lower rate of compensation is appropriate. The other reason
is the Court's deference to the long-established policies in
this district concerning what costs are appropriately charged
to the estate and what are not, whether counsel are local or
national.

With respect to PwC, the Court has already noted that the
only issue left for decision is the question of rates. The
estate may employ that financial consulting firm, subject to
the rates being reduced to the levels sought by the firm in
the Edwards Theaters cases in the Central District of
California (UST Exhibit 14, summarized in UST Exhibit 21).
Those hourly rates are as follows: partners/directors ($400 -
$450), managers ($300-$350), associates ($150-175), senior
associates ($200-275) and professional assistants ($90). PwC
may also charge New Mexico gross receipts tax as may be
necessary. As with Skadden, no rate increases shall be
allowed except upon application to the Court, and the Debtor
is authorized to pay monthly to PwC 75% of the fees billed
each month and 100% of the costs, with 25% of the fees to be

held back until further order of the Court.  And the same cost
limitations are imposed on PwC.

The reasons for the reduced rates are the same as are
applicable to the rates allowed Skadden.  And while the Court
is aware that PwC sought a rate of $590 per hour for its
former retail chain chapter 11 CEO now turned consultant, the
Court is comfortable that PwC can achieve results for the
estate at the $450-per-hour level as the maximum rate.

**CONCLUSION**

For the foregoing reasons, the Debtor may employ Skadden,
Arps, Slate, Meagher & Flom, LLP and its affiliated law
practice entities as general bankruptcy counsel at the rates
and under the conditions set forth herein, and may employ
PricewaterhouseCoopers as its financial consultant at the
rates and under the conditions set forth herein.  Orders
consistent with this memorandum opinion shall issue.

Honorable James S. Starzynski
United States Bankruptcy Judge

Case 01-10779-sh7    Doc 679    Filed 06/27/01    Entered 06/28/01 09:44:00 Page 46 of 49

I hereby certify that on June 27, 2001, a true and correct
copy of the foregoing was either electronically transmitted,
faxed, delivered, or mailed to the listed counsel and parties.


Robert H. Jacobvitz                 Charles A. Beckham, Jr.
500 Marquette NW #650               1000 Louisiana, Suite 4300
Albuquerque, NM 87102               Houston, TX 77002

William F. Davis                    Office of the UST
PO Box 6                            PO Box 608
Albuquerque, NM 87103               Albuquerque, NM 87103-0608

Paul M. Fish                        Richard Levin
P. O. Box 2168                      300 South Grand Avenue
Albuquerque, NM 87103               Los Angeles, CA 90071-3144


_Mary B. Anderson_

Page 46 of  46

CONFIDENTIAL

Exhibit "A"

# SASM&F LLP & AFFILIATES

## INTERNAL TIME CHARGE SCHEDULE*

September 1, 2000

|  | Standard Bundled Rate |
|---|---|
| **PARTNERS & OF COUNSEL:** | $445 - $670 |

### COUNSEL AND ASSOCIATES:

|  | Rate |
|---|---|
| Counsel & Special Counsel | $415 |
| Associate Class 1991 & Prior | 405 |
| Associate Class 1992 | 405 |
| Associate Class 1993 | 390 |
| Associate Class 1994 | 375 |
| Associate Class 1995 | 365 |
| Associate Class 1996 | 355 |
| Associate Class 1997 | 340 |
| Associate Class 1998 | 310 |
| Associate Class 1999 | 280 |
| Associate Class 2000 | 230** |

## LEGAL ASSISTANTS:               $80 - $160

---

\*      These are the standard hourly fee rates for most attorneys and legal assistants and do not include amounts for charges and disbursements. In a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated. In addition, the Firm has a standard "bundled rate" for clients who are not billed separately for word processing, proofreading, facsimile or overtime meals, and in-house reproduction is charged at $0.10 per page.

\*\*      First year associate standard will move to the rate of $250/hr. on April 1, 2001.

## Appendix 4

### Skadden, Arps Attorneys

| Attorney | Position | Department | Law School | Degree Date | Hourly Rate |
|---|---|---|---|---|---|
| Jay M. Goffman | Partner | Corporate Restructuring | University of North Carolina | 1983 | $630 |
| Richard B. Levin | Partner | Corporate Restructuring | Yale Law School | 1975 | $590 |
| Peter W. Clapp | Counsel | Corporate Restructuring | University of California, Hastings College of the Law | 1982 | $415 |
| Donna McGraw Weiss | Associate | Corporate | Harvard Law School | 1994 | $375 |
| Alan J. Carr | Associate | Corporate Restructuring | Tulane University Law School | 1995 | $365 |
| Barbara R. Mirza | Associate | Employee Benefits | University of Toronto | 1995 | $365 |
| Stephen J. Lubben | Associate | Corporate Restructuring | Harvard Law School; Boston University School of Law | 2000; 1996 | $355 |
| Amy S. Park | Associate | Corporate Restructuring | Seton Hall University School of Law | 1996 | $340 |
| Jena Q. Bridges | Associate | Corporate | University of Virginia School of Law | 1997 | $340 |
| Jamie Edmonson | Associate | Corporate Restructuring | Loyola Law School, Loyola Marymount University | 1996 | $310 |
| Q. Scott Kaye | Associate | Corporate Restructuring | University of Florida School of Law | 1999 | $280 |
| Vanessa P. Rubinstein | Associate | Corporate | Northwestern University School of Law | 2000 | $230 |

N.B.    Includes all attorneys who have billed more than 10 post-petition hours in the Debtor's case as of April 1, 2001.