UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

PACER Cover Sheet
for Electronically Filed Documents

Any data shown here are current as of 06/14/06    . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

| | |
|---|---|
| **Case Title:** | Furr's Supermarkets, Inc. |
| **Case Number:** | 01-10779 |

### Document Information

| | |
|---|---|
| **Description:** | Minutes of Hearing Held On 5/14/02 Re: [1463-1] Application For Compensation ( Fees: $ 48,495,50, Expenses: $ 4425.17) by Stuart E. Hertzberg, I. William Cohen, P. Casey Coston, [1334-1] Application For Compensation ( Fees: $ 1,096,641.92, ) for period of 9/1/01 through 10/31/01 and 2/21/01 through |
| **Received on:** | 2002-05-14 14:17:25.000 |
| **Date Filed:** | 2002-05-14 14:17:25.000 |
| **Date Entered On Docket:** | 2002-05-15 00:00:00.000 |

### Filer Information

| | |
|---|---|
| **Submitted By:** | Jill Peterson |

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date. To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

**Clerk's Minutes**

Before the Honorable James Starzynski

James Burke, Law Clerk
Jill Peterson, Courtroom Deputy

Joe Jameson Court Reporters
(505) 242-2809

Sara Edmonds Troske

**Date:**
**TUESDAY, MAY 14, 2002**

**In Re:**
**FURRS**
**No. 7-01-10779 SA**

**Oral Ruling on Application for Fees by Pepper, Hamilton**

**Oral Ruling on Application for Fees by Deloitte and Touche**

**Attorney for Heller: Paul Fish**
**Attorney for UST: Ron Andazola**
**Attorney for UCC: William Davis, William Cohen and Casey Coston**
**Attorney for Trustee: Robert Jacobvitz**
**Attorney for Deloitte: Michael Li**
**Attorney for MetLife: Jennie Behles**

_____

**Summary of Proceedings:**                        Exhibits _____

                                                   Testimony _____



**ORAL RULING ATTACHED**

**JACOBVITZ WILL PREPARE ORDERS**

1334 and 157; core; 7052

Overall  standards (§330(a) is the standard):
1.     The Court is not bound to accept the agreement of the parties as to
       compensation, and may (and indeed may be required to) independently make
       a determination of the amount of compensation that should be allowed.
       In re Albrecht, 245 B.R. 666, 672 (10th Cir. B.A.P. 2000) (bankruptcy
       court has an independent duty to review professional fee applications,
       even if no party in interest objects), affirmed In re Albrecht, 233 F.3d
       1258 (10th Cir. 2000).  And an overarching standard for the award of
       fees is what value the services contributed to the estate, regardless of
       what the lodestar figure (rates times hours) is.  Rubner & Kutner, P.C.
       v. U.S. Trustee (In re Lederman), 997 F.2d 1321, 1323 (10th Cir. 1993).
Some overall considerations in this case:
2.     The primary events or actions that contributed the substantial value to
       this estate were the Fleming sale, the slowing of the massive losses
       being suffered by the estate so that the estate's assets were preserved
       long enough to be sold (in this case, to Fleming)[1], and the day-to-day
       work of administering the estate, including but not limited to
       implementing the Fleming sale and ensuring that the W-2's and 1099's
       will be issued timely and the employees' pension and 401(k) funds are
       safe and available to the employees.  The sale to Fleming was brought
       about largely by the efforts of Messrs. Golleher and Mays, Peter J.
       Solomon Company and the estate's counsel (Skadden, Arps, Slate, Meagher
       & Flom, and Jacobvitz, Thuma & Walker).  The partial turnaround of the
       company came around largely as a result of the management skills of
       Messrs. Golleher and (especially) Mays.  And the day-to-day work of
       pushing the estate through the chapter 11 liquidation process (including
       preparing the estate for the conversion to chapter 7) was due in large
       part to the efforts of Jacobvitz, Thuma & Walker.
3.     The Unsecured Creditors' Committee ("UCC") and its professionals will
       have contributed value to the estate to the extent that their efforts
       helped bring about those benefits and to the extent that the UCC
       (including its professionals) benefitted its constituency and
       contributed to the administration of the estate.  From a review of the
       file and the applications and objections, it appears that the UCC on the
       whole contributed relatively little to the major events that benefitted
       the estate.  The sale to Fleming was brought about largely by the
       efforts of Messrs. Golleher and Mays, Peter J. Solomon Company and the
       estate's counsel (Skadden, Arps, Slate, Meagher & Flom, and Jacobvitz,
       Thuma & Walker).  The partial turnaround of the company came around
       largely as a result of the management skills of Messrs. Golleher and
       Mays ("G&M").  And the day-to-day work of pushing the estate through the

---

[1] A substantial added benefit for Furrs employees of the partial turnaround that prevented most of the stores from "going dark" before a sale was the continued employment of thousands of the employees.

chapter 11 liquidation process (including preparing the estate for the conversion to chapter 7) was due in large part to the efforts of Jacobvitz, Thuma & Walker. In none of these three areas did the UCC play a significant affirmative role. Were those the only matters that counted, the UCC would not be able to show that their services were "necessary" for the estate, <u>In re Lederman</u>, 997 F.2d at 1323-24 (inability of debtor in possession to develop and complete a plan should have been apparent to counsel from commencement of the case, and thus debtor's counsel's work was not necessary and would not be compensated). The UCC (and its professionals) did monitor the sale, the turnaround and the administration of the chapter 11 case, and did look out for the interests of its constituency, and for that reimbursement is due, since that function is necessary for the estate.

4. On the other hand, this is an estate that may be threatened with administrative insolvency, and even if not, there is a question about whether the priority claims will be paid in full, and even if the priority claims are paid in full, there will be little if any distribution on non-administrative and non-priority claims, such as the prepetition severance pay claims of the laid-off employees. Thus this case was less than completely successful.

5. But the fact that the case may be administratively insolvent is not a reason for reducing fees as a way of distributing the (perhaps) limited funds for professional fees. In other words, I should determine what the services for all the professionals were worth as if there were enough money to pay all the fees in full, and then the reduction due to admin insolvency (if that turns out to be the case) can take place on a purely mathematical or automatic basis.

6. Issue of rates is not before the Court, because of language of §328(a) which limits changing the compensation rate to changes in circumstances that could not be reasonably anticipated at the time the rates were ordered.

7. Also, the statute provides that the Court must take into consideration "whether the services were necessary to the administration of, or beneficial <u>at the time at which the service was rendered</u> toward the completion of, [the case];..." § 330(a)(3)(C). In other words, as Deloitte's counsel accurately argued, if a professional took an action which at the time would have appeared to a reasonable person as necessary, hindsight and changing circumstances should not intervene to decrease the compensation allowed for that work.

8. This is not applying the old "economy" rule that the Code has forbidden; rather, it is applying a standard that a hypothetical informed and reasonable client would impose upon reviewing the bills.

9. In that connection, I think that a client would question the total UCC professional compensation and committee reimbursement of $2.35mm. Given the role of the committee in a chapter 11 case and given the fact that this case may have started out as a "national" (big) case but relatively quickly began to look like a lot of "sound and fury signifying nothing" (so to speak), $2.35mm is too much for the committee to have spent on its professionals.

10. Also, fairly soon it should have been clear that a sale of the business was a good possibility (despite all the talk of the "stand-alone" plan), that the sale would have to be substantially in excess of the secured debt in order to generate anything for the unsecured creditors (given among other things the rate at which the professional fees were being

accumulated), or at least that the committee would have to find significant unsecured assets, and that such a sale would be unlikely to happen.
11. Would be helpful if applications were done sort of like Skadden's: description of what the category covers and then (1) a fee app total for that category (2) inserted at that point (in the front of the application).

==========
COMMITTEE EXPENSES

I have reviewed the committee's application for reimbursement of expenses and also the UST response and the Heller Objection.

First, for simplicity's sake, I need to address the expenses incurred by Sandra Shirmang (the Kraft representative) for the trip to ABQ two days before the UCC was constituted. The trip began on February 12, and the Committee members were appointed by the UST on February 14. That figure is $786.31, and it may not be reimbursed. I am not even sure why the figure was included in the list of expenses to be reimbursed. At a minimum, and even assuming that part of the expenses for this trip were incurred on or after February 14, the amount should have at least been prorated. I have to wonder therefore what was going through the mind of Ms. Shirmang and of Committee counsel when that got put into the reimbursement request.

As I said at the beginning of the evidentiary hearing, in the larger picture, in terms of money, this application is small potatoes. And these folks did put in the travel, etc., and presumably did the work, and their companies are getting paid little if anything out of this, and I don't want to discourage future creditor participation on committees by denying or substantially trimming reimbursement of these expenses.

However, in this case (after I had pretty much made the foregoing remarks to everyone and suggested that there was not much point in challenging the committee expenses), what was disclosed during the final hearing was what I consider to be unusual circumstances that warrant reducing the reimbursement of committee expenses.

The witness speaking for the committee was Mr. Salvadori. He was the one selected by the committee counsel to speak for the committee, and I think that he testified candidly. As is apparent from the remarks that follow, I have taken Mr. Salvadori as a representative of the Committee not only officially but as representative of the committee members' attitudes and decision-making.

VP of credit services for Con-Agra. 2nd largest food processor in US; $27mmm sales. Chair of the UCC. He also served on the Bruno's, White's Farm Fresh, Revco and both Grand Union cases, among others. Other committee members included giants such as Kraft, Pepsi and Nestle. And there were others in this diverse group – Rick Johnson, a union representative, Bueno Foods, and Earthgrain Foods – that were not and should not be considered naive and inexperienced.

What clearly came across to me, from Mr. Salvadori, were two things in particular:
a. It was quite clear to me that the committee's attitude was that the debtor should be heeding the committee's advice to the debtor on how to run its business, and that the committee should act almost as a board of directors or oversight management team for the chapter 11 proceedings, and that if the debtor did not heed the committee's instructions then the committee would not relent in attempting to force the debtor to do things the "committee way". An

example of that was the continued insistence that a trade lien be set up as a method of financing inventory purchases. Even if this were to have been shown during the trial to have been a viable mechanism (and it was not), the DIP had the business discretion not to pursue that avenue, and it almost seems as if when the DIP did not heed the committee's advice, the committee looked on the DIP as being defiant or recalcitrant.

Concerning the trade lien, which was a recurring theme of why the committee and its professionals took various positions and action, there was no proof that the trade lien was a viable idea in this case. For one thing, there was no proof that they (DIP and/or committee) would be able to get vendors who were getting cash up front to instead take an admin lien and undergo risk of nonpayment. And Mr. Forcum was unable to say how or whether it would have worked. Salvadori testified that Mays admitted in June that he (Mays) should have pushed for trade lien. But this single allegation, unsupported by any detail, any documentary evidence, and especially by any testimony from Mays himself, who presumably was available to at least give a deposition, is not sufficient evidence to establish anything. And in any event by April 18 the committee knew that Debtor was not getting enough trade credit, so the issue of a trade lien should have become a more minor issue in the relations between the debtor and the committee.

In fact, I must say that my sense of the trade lien issue is that it became a bigger issue in retrospect; that is, as a way to argue for the justification of actions taken and of fees, rather than only an issue at the times that it was raised with the debtor.

And similarly, there was discussion about the committee's continuing hopes for a "stand alone plan" – that is, a plan that would allow the business to continue in some form, so as to provide a return to unsecured creditors, instead of a sale. Throughout the case there really was little prospect of a sale for such a large price that would result in anything for the unsecured creditors, especially after not only the secured creditors were paid, but after the administrative and priority claimants were also paid. From the outset the committee knew that the secured creditors were seeking a sale of the business, and that the DIP was pursuing a sale as at least one very serious option, and the reports from DT/DC should not have provided a committee of objective experienced business people with much hope of a sale that would be so successful. Yet the committee and its counsel have taken the position that such a sale was one of the reasons that they pursued the case the way they did. Again, it appears to me that this is a position taken by the committee and its counsel more in retrospect than in reality at the time.

b. Mr. Salvadori admitted that the committee considered that the money to pay the committee professionals was coming from the secured creditors and not from the pockets of the committee members. It is true that Salvadori said in response to the Court's question that the committee thought all the expenses would be covered by funds generated from the DIP's operations or assets. However, in subsequent questioning by Heller's counsel, Mr. Salvadori said that committee counsel said that secured lender would pay this, although that would reduce the dividend to unsecured creditors. He thought there was a carve out: it was funded, and a certain amount would go to pay DIP and UCC professionals, and that was the secured lenders' money. And in connection with the Motion to Appoint a Trustee, Mr. Cohen conceded (to his credit) that the committee did not care about the cost at that time when it instructed its counsel to file the motion for the appointment of a trustee. In consequence of those facts or understandings, the committee did not monitor or attempt to hold in check the fees being incurred by the committee professionals.

I also think that, given this committee's experience and sophistication, the committee should be charged with monitoring their counsel. Were the committee less sophisticated, as is frequently the case in the few New Mexico chapter 11 cases that have committees, I would certainly not expect the committee to do that monitoring. But here, the committee members were from companies that routinely hire and pay significant attorney fees each year; many of them are truly what law firms covet as "blue chip" clients. And as such, the Court is convinced that each (or almost each) member of the committee inspects its own counsel bills closely, to ensure that it is getting full value for the dollar, if not more. No such monitoring or inspection took place in this case, and that is a second reason for reducing the committee members' reimbursement.

This would be a good time to talk for a moment about a related issue, and that is where the DIP was going financially early on in the case, and what the committee knew about that and what it did about that. The introduction of DT Ex. M (the DT presentation to the committee at its April 18 meeting), and the cross examination of Salvadori about that presentation, make it fairly clear that by the April 18 meeting, the committee knew or should have known that DIP was doing even worse than its (DIP's) downgraded projections. Pp. 5-6. The DIP was getting virtually no trade credit (e.g., p. 26). The DIP was replenishing inventory with DIP facility. The DIP was in violation of a number of its borrowing covenants under the DIP Financing order (p. 28). And at this time Golleher was talking to them of a sale, and he was an experienced person to be talking about that sort of thing.
Further bad news in the April 18 presentation was the 25% lower attendance as of April 7, and the average transaction amount being down from CY 2000 by 24%. P. 18. D&T predicted that DIP would be out of cash by the week of June 2 (page 27), and would be unlikely to be able to increase weekly sales enough to break even (page 37).
In summary as of April 18: sales projections were off, there were no lenders willing to step in, and the debtor soon would be out of money. And page 69 of DT M showed more bad news: a deficit of $3mm/week, the trade lien idea was not going anywhere, and there was heavy use of DIP facility.
Pp. 78-93 of DT M was the valuation of sales of stores: market and income approach. That valuation analysis shows $140-180mm as the possible sale price range, but with warning that if the revenue targets were not met (and they were not being met), the income valuation could be "significantly worse".
Then on page 99, is the Preliminary High Level Liquidation analysis, showing a recovery range of a high of $127mm down to $61mm, and page 106 shows $160mm in secured debt. Mr. Salvadori testified that those numbers did not include the Fleming "give-back" (22 stores that Fleming would not take – although as of April 18 he would not have known of the Fleming sale) plus unsecured leases. But even taking into account the Fleming give-back, is it credible to think that the 22 stores that Fleming did not want even for resale to someone else represented the possibility of significant net income to the estate? Later testimony not related to DT M also made clear that the committee never really considered as a source of income for the estate any potential preferences that committee members may have received. So only the unsecured leases represented much real value for claimants other than the secured creditors in April 2001.

Bottom line, there was a lot of bad news in DT M that should have put the committee on notice that this case was not turning out to be a big or even small successful reorganization that would support a lot of work and a lot of fees for that work. And I think the committee could and should have concluded this. And without going into the details, the news that came from the debtor

in the following weeks and months did not provide any grounds for an
appreciably more optimistic outlook.  It was clear from the outset of the case
that a sale of the entire business was a strong possibility, and that the
secured creditors, who had insisted that the DIP Financing Order include a
provision for an investment banker to investigate sales, were in favor of such
an outcome.  And it was just not credible to believe that these secured
lenders would be likely to give up or concede any significant amount of the
assets that they had a lien on in order to pay for professional fees or, for
that matter, to pay for anything else that the lenders did not think was going
to directly and substantially benefit them.  For the most part, that "giving"
was done (that is, any concessions were made) either in the DIP Financing
Order or in the hiring of Golleher and Mays.

     This analysis of the status of the debtor by mid-April 2001 is
applicable to all the compensation applications being addressed today.

     In consequence of these findings, but also taking into consideration the
competing policy of not discouraging creditor participation in future chapter
11 cases and recognizing that the committee members did expend their
companies' time and money in rendering service to the estate, I will order
that the expenses of the committee be reduced 20%.  That may in effect be
little more than a slap on the wrist, especially for companies such as Kraft,
Nestle, Con-Agra and Pepsi, but for companies of that size, even denying all
reimbursement would be little more than a slap on the wrist.  Still, it is
important to recognize the problems with the services rendered by the
Committee members.  Thus, the arithmetic of the allowance of the reimbursement
is as follows: the committee application seeks $35,648.09, from which Ms.
Shirmang's expenses of $786.31 are subtracted, leaving a remainder of
$34,861.78.  80% of that figure is $27,889.42, and that is what is allowed for
reimbursement of the Committee expenses.

==============

PEPPER, HAMILTON

I had thought that the First Fee app (#897) was for $617m, but the numbers do
not add up to that, so I don't know where that information came from.  Not
before the Court was Pepper Hamilton 3 (#1463): $48m fees and $4m costs

     Mr. Cohen argued in his opening statement that behind the scenes the
committee professionals of Pepper were able to accomplish significant savings
for the estate.  I did not see much evidence of that in the record.

     On a similar note, I agree with that part of the opening statement of
Mr. Keleher in which he said that the professionals (at least ones paid at as
a high rate as these ones) are paid to make quick accurate decisions (and
recognize reality).  I don't see that that happened in this case as much as it
should have.

     Mr. Cohen's testimony was that at the outset the debtor was overly
focused on the KERP (Key Employee Retention Plan) and compensation of its
managers and not on the critical issues of keeping the business running,
getting inventory on to the shelves in an economical way and reducing expenses
and unprofitable operations (the 4-wall EBITDA issue, among others).  In
addition, Dahlen did not even show up to meet with the committee (although
whether Dahlen's departure was a disadvantage is certainly debatable), and the
committee did not have confidence in Mortensen, who was saying among other
things that the company had adequate financing and would soon emerge from this
chapter 11.  Mr. Forcum largely echoed this view during his testimony.  And
somewhat later, although Mr. Cohen had a good relationship with G&M, they
seemed to be jumping back and forth between reorganizing the company and
selling its assets, and the company itself was in turmoil.  Based on his

considerable experience, these should have all been warning signs to Mr. Cohen that this might not be a well run chapter 11, leading to concomitant concerns about minimizing expenses.

Part of the testimony focused on the billing produced by attorney Casey Coston. Heller and UST argued that Mr. Coston overbilled on some matters. For example, on two days (February 21 and 22), Mr. Coston billed a total of two hours and 1.8 hours respectively – 2/10 of an hour per entry for ten entries on the first day and 2/10 of an hour per entry for nine entries on the second day – in reviewing entries of appearance and apparently dictating something such that a secretary or legal assistant entered the party represented in a party database as part of the Pepper firm's tracking of the case and making information available to the committee and its professionals. (There is some considerable question in the mind of the Court whether this sort of work could not and should not have been done by a paralegal, but the Court does not need to consider that in light of its disposition of the applications.)

In this case, despite the explanations by Mr. Cohen, the Court finds that Mr. Coston overbilled the review of the entries of appearance. The Court accepts billing in minimum increments of one tenth of an hour, subject of course to overriding considerations of whether a matter should be billed at all, or written down in a subsequent review of the bill, etc. In this case there was simply no reason to bill a review of an entry of appearance at, say, 6 ½ or 7 minutes (the minimum that it would take to get over the .1 incremental minimum). Pepper simply did not provide sufficient proof (and the applicant is the one that has the burden of persuasion for its compensation applications) that whatever Mr. Coston was doing, or whatever the Pepper system was for keeping track of parties in a case, was worth that time.

But the Court's concern in this instance goes further. Mr. Coston should not have billed the review of ten entries of appearance for a total of 1 hour or nine entries for .9 hour.. The Court is comfortable that the entries of appearance for those days could have been "batched" and dealt with in their entirety in one-tenth or maybe two-tenths of an hour each day. Permitting minimum billings of one tenth of an hour, as is the norm outside the bankruptcy world as well as inside it, is not a license to manipulate the work to achieve the maximum billing for that work that should fairly be billed at a much lower total. The test is not merely a mathematical one of how many increments of time the work can be stretched to cover, but rather how much time it reasonably takes to get the work done, albeit with a recognition that the transaction costs of recording time, etc. ought also to be taken into account and compensated (resulting in the widespread acceptance of a minimum billable unit of one-tenth of an hour).

Further examples of Mr. Coston's overbilling are that he appears to have spent an hour on Feb 23 comparing compensation procedures in other cases and this one. The explanation from Mr. Cohen was that they were concerned that the proposed interim comp provisions would not work in this case. But this is not billable. And in the First Fee App: Tab 4, page 76 – .5 for Mr. Coston to review UST objection to the Solomon employment app (doc 565) on June 21. But the minutes (doc 599) show that the UST objection was denied at a hearing on June 13. And Tab 4, page 15 (first entry on June 15, 2001) shows that Mr. Coston reviewed copy of those minutes of June 13. And at Tab 4, page 76: second entry – Coston recorded 1.3 hours on issue of indemnity. But next day was the hearing on employment of Chanin on Wed, June 27 (minutes). Chanin was the only UCC pro seeking indemnification. This research was directed at Solomon. If court had already approved indemnity for Solomon, then this work

would not be needed.  Again, this work has the appearance of billing simply for the sake of billing and little more.

No doubt Mr. Coston did in fact do work, and probably a substantial amount of work, for which he billed the appropriate amount of time.  But practically speaking the lodestar approach to billing and to allowing compensation is necessarily based on an accurate and reasonable statement of the time spent in doing the work, and everyone's assumption that the statement of time will be accurate and reasonable.  (And the reality is that, with rare exceptions, when we – judges, professionals, and everyone else in a case – review fee applications, we all start with the assumption that the time sheets submitted with fee applications are accurate.  That is consistent with our further assumption that lawyers and other professionals are basically honest people until shown to be otherwise.  And to assume otherwise at the outset in every case would increase the transaction time for every application immensely and for no good purpose.)  Mr. Coston burst that assumption in the case of his time entries.

The problem that this overbilling causes for Pepper is that it seriously affects the credibility of Mr. Coston; the Court has serious questions about how many other time entries he recorded that are inflated.  And in turn, the Court wonders why there was no review of his time entries by one of the two Pepper attorneys who had the primary responsibility for this engagement.  (It seems that it is already clear to the Court why the committee did not review or object to the billing, or at least one reason is clear; as recited above, the committee felt that it was not paying the bills and therefore it did not care what was billed to the estate.)  In any significant engagement, whether in or out of bankruptcy (and this was certainly a significant engagement), a firm is expected to have someone in charge of the engagement review the bills for accuracy and reasonableness, both as to the individual entries and the overall billing.  That was not done in this case.  Thus the firm itself fell down on the job, as did its client the committee.

Mr. Cohen did testify that the individual timekeepers at the firm have a system for inputting time, and that they are, in his experience, honest and forthright people who would not pad their time.  For the most part, the Court finds from the time sheets that it has examined that Mr. Cohen's assessment is probably correct.  But Mr. Cohen said that of Mr. Coston also.  And while Mr. Coston may be honest and forthright, his understanding of what is acceptable for billing is not.  A review of the time entries seems to focus the problem of overbilling for individual entries on him.  In consequence, we really don't know, with respect to Mr. Coston, what billing is accurate and what is not.  The Court assumes but (as in most cases) will never know for sure exactly how much time each task actually took the biller to accomplish; since the Court was not there to observe the process, the Court must necessarily rely on an examination of the bills themselves, the surrounding data and the honesty or integrity of the persons doing the billing.  For most of the employees of the Pepper firm, that examination sufficiently evidences honesty and reasonableness.  The same cannot be said for Mr. Coston's billing.

In <u>Gray v. English</u>, 30 F.3d 1319 (10th Cir. 1994), the court provided guidelines for reducing compensation in light of misconduct.  In that case the bankruptcy court had denied fees to a law firm in the amount that was earned by an attorney of the firm that had lost his disinterested status (by surreptitiously purchasing a claim against the estate), but had not denied the fees earned by the other members of the firm who had performed services for the estate and who were unaware of the wrongdoing of the attorney in question.

On review, the Tenth Circuit panel did not overrule the decision, since it was within the discretion of the trial court. But the panel did say as follows:

> In exercising the discretion granted by the statute we think the court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer fiduciary can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose. This approach is most in keeping with common law fiduciary principles and best serves the deterrent purpose of the rule. See <u>Continental Ill. Nat'l. Bank & Trust v. Charles N. Wooten, Ltd. (Matter of Evangeline Ref. Co.)</u>, 890 F.2d 1312, 1322-24 (5th Cir. 1989) (fraudulent fee application deserves denial of all compensation). (Other cite omitted.) 30 F.3d 1324

I realize that this is not a case of lack of disinterestedness or conflict of interest. But the Tenth Circuit did cite to such a case, which was the <u>Evangeline Refining</u> case. In that case, the Fifth Circuit did deal with time records that appeared to be falsely submitted, and ended up remanding the case with directions that the bankruptcy court state the basis for the amounts that it subtracted, and did not subtract, from the amount of compensation sought by the applicant. At page 1325 of the case (not the portion of the case cited by the Tenth Circuit), the 5th Circuit panel stated as follows:

> When a trustee or attorney for the trustee intentionally misrepresents facts to the court in a fee application or in related proceedings, a mere reduction in fees would clearly be an inadequate deterrent. At least where such misrepresentations are serious or substantial, all compensation should be denied. 890 F.2d at 1325.

I take <u>Gray v. English</u>, and I took it this way when it first came out, as a caution by the Tenth Circuit to deal firmly, if not even expansively, with situations in which the applicant has violated the Code or otherwise misbehaved.

In this instance, the Court finds it appropriate to disallow any fees for any of the work done by Mr. Coston that appears in any of the fee applications. This addresses not only the evident overbilling for which he was responsible; it also addresses the failure of the firm to monitor his billing. Disallowing all of Mr. Coston's billings may seem harsh, but it puts Mr. Coston in the position of dealing with his firm about this problem, it takes into account the fact that the Court cannot tell which of his billings are accurate (thus demonstrating the effect of the firm's failure to meet the burden of persuasion concerning his billings), and it sends a message to the Pepper firm that someone needs to ensure the accuracy of the bills.

Disallowing all of Mr. Coston's time precludes the necessity for me to spend additional time pointing out various entries in Mr. Coston's time sheets that would be disallowed anyway. For example, the entries early in the case reflecting Mr. Coston's learning the billing practices approved by the bankruptcy judges in this district, and the additional time spent preparing the form of order allowing the firm to be paid 75% of fees and GRT and 100% of costs on a monthly basis, is something that a firm that wishes to practice in various jurisdictions around the country needs to learn as part of that national practice, and not bill the estate for.

In addition, there are three areas of work for which the Court has major reservations about full compensation for all that the firm has billed for: the challenge to the employment of the estate professionals Skadden and Solomon, the challenge to the employment (in reality, the rates of compensation) of

G&M, and the M/Appoint Trustee.  These are things the committee wanted pursued but turned out not to benefit the estate much if at all.  And this is in addition to the time spent on the executive search for new management for the DIP, which this Court considers to have been an overreaching by the committee of its role and largely a waste of time.

(Mr. Cohen testified that Pepper's position was that, even when it disagreed with the committee – the client – it would nevertheless do as instructed, and if a court later ruled that the action taken for the committee should not be compensated, that was a burden or loss that the firm would shoulder.  Given the longstanding relationship between Pepper and some of the larger committee members, as illustrated by the Jitney Jungle and Bruno's cases, for example, Pepper's policy probably makes good business sense.  But the Court also accepts the reasoning given by Mr. Cohen, that Pepper wanted its client to be able to make its decisions unhindered by a consideration of how the work would be paid for.  (Outside of BR, this is less of an issue: if the client wants it done and it is ethical, can do it if client is willing to pay for it.  Inside BR, when the issue is whether a judge will allow it to be paid for and there is no back up source of payment, the issue is more complex, at least for some firms.)  In this case, Mr. Cohen testified that he discussed with the committee the possibility that the challenges (Skadden and G&M) might be seen as a fruitless gesture, but did not mention not getting paid because he did not want that to seem to be a motivating factor.  And at Pepper, they do what the clients want (but not of course anything illegal or unethical), regardless of these issues of payment.)

So a further discussion of these three factors and the reductions attributable to them, are as follows:

The challenge to the employment of estate professionals Skadden and Solomon:

The committee challenged Skadden's employment for conflicts of interest, including particularly Skadden's relationship with a number of creditors in the case such as Metropolitan Life.  PH's advice to the committee, that such a challenge was likely to fail, and that indeed PH itself had relationships with some of the creditors, appears to have fallen on deaf ears.  PH is to be credited with providing this advice that turned out to be so accurate.  Why the committee ignored the advice is not clear; it may have been perhaps merely the intent to deprive the estate of nationally recognized competent counsel.  Nevertheless, the objection was joined in by the UST, and usefully aired factual and legal issues that were resolved with a court decision that, one hopes, contributed to more confidence in the administration of this case and the bankruptcy system in general.  Thus, even though the committee could usefully have taken its counsel's advice on this subject, or should have, I am hesitant to in effect punish the firm for the committee's decision on this particular issue, despite the Firm's position on what happens when the committee tells it to do something that the Firm advises against.

I do have some question about why the committee challenged the indemnity provisions of Solomon and then did not at least promptly withdraw the challenge when its own investment banker, Chanin, demanded the same treatment.  But at least the committee's counsel argued for the same treatment at the end of the day.

The category that these objections came under is B171 – Employment of Professionals/Objections, and includes as well objections to the hiring of the investment bankers, who ultimately were hired on much the same basis as the Committee's investment bankers Chanin.  The First App lists total fees for this work of $33,919 (from pp. 8-9 and page 2 of each of the attached four

invoices); the Second App is for a negligible amount. The Court will not deduct anything from this category.

The challenge to the employment terms of Golleher and Mays, and the M/Appoint Trustee.

At the end of the day (literally, in this instance), the fight over the employment of Golleher and Mays came down to a comparatively minor adjustment in the compensation of those two for what they were being hired to do. Mostly that fight was a waste of time and money. Similarly, the motion to appoint a trustee, which was filed and never litigated (indeed, the Court questions whether it was ever genuine), was a waste of time and money. These actions by the committee, in the face of contrary advice from its counsel, appear to be part of that almost-hubris that seems to have characterized much of what the committee did during this case.

The category for this work was B190 – Contested Matters/Motions (page 9 of the First App), and the total in the First App was $32,041 (second page of the second, third and fourth invoices). Although some of the time in that category was usefully spent, such as analyzing the terms of the G&M agreement, that review and advice to the committee should have cost no more than about $2,000. This portion of the application will be reduced by $30,000, leaving an allowed balance of $2,041.

Two other factors lead the Court to further reduce the Pepper bill: evidence of overworking some matters (with the concomitant failure to review), and the financial precariousness of this reorganization which began to become evident at the April 18 meeting, if not before. Mr. Cohen admitted that following the May meetings, the committee met by telephone, which this Court takes as one example of a recognition that at least by after the May meetings, the committee and its professionals realized that this case might face serious financial problems. In fact, according to Mr. Cohen's testimony, he admitted that by April he knew the company was having significant cash problems, and indeed, at the first meeting with the DIP's representatives right after the case began, the DIP made a poor showing, focusing not on financing but on the Key Employee Retention Plan (KERP), and this in a business where the profit margins are quite thin to begin with.

An example of overworking the case is the time spent on the preparation of the minutes of the March 23 committee conference call reflected in PH-K. And all this was going on in view of the financial precariousness of the debtor.

Finally, I am left with an impression of carelessness on the part of the applicant's senior counsel. For example, the committee's application for reimbursement was signed by Mr. Hertzberg, and it asked for reimbursement for committee expenses of $630,278.26. That figure, wildly inaccurate on its face, appears about two inches from Mr. Hertzberg's signature. It is not like the number is buried in the text of the document and not especially noticeable. Did Mr. Hertzberg even look at the figure before he signed the application? And Mr. Cohen testified that no one reviewed the first PH application before it was signed and filed. Would they have forgotten to do such a thing before sending out a bill to a client, including one the size or stature of a Con-Agra, Kraft, Nestle or Pepsi? I don't think so.

At the same time, there clearly was good work that PH did, and some work that was of particular benefit to the estate. For example, the B112 category – General Creditor Inquiries – consisted of "time spent by Applicant's professionals responding to telephone calls and correspondence received from creditors and other interested parties inquiring about the status of the case

and other matters of a general nature." One of the serious problems in this case was the difficulty of informing the general creditor body who could not afford counsel – primarily employees and small (and some not so small) vendors – about how the BR process is supposed to work, what are the priorities for payment, what payment they could expect, why some people were getting paid literally millions of dollars when others were not getting paid anything, etc. That job did not get done well by the Debtor in this case (although maybe the Debtor could not do it), and the press did not do it (although accurate and comprehensive reporting from the press would be nice, that is not necessarily something that ought to be expected), so the firm should be compensated fully for that work. The firm should also get credit for having local counsel cover many hearings, as set out in B155 – Court Hearings, for reducing the non-working travel time by 50%, as set out in B195 – Non-Working Travel, etc. And Mr. Cohen testified that he did not bill for his time spent at the auction of the stores.

In summary, taking into consideration the additional concerns expressed above, I think it is appropriate to further reduce the bill by 20%, to reflect the value to the estate as accurately as I can.

In this connection, Heller has argued that Mr. Coston's overbilling, other instances of overbilling, and the failure to review the first fee application before filing, mean in effect that the entire billing was fraudulent and ought to be disallowed in its entirety. I have considered that option, especially in light of the guidance proffered by the Tenth Circuit in Gray v. English, but rejected it as too harsh in these circumstances, given that Gray v. English involved a specific fraudulent scheme worked on that court and the bankruptcy system that constituted significantly more culpable behavior than here, given that there was value contributed to the estate and given that I believe that the majority of the work done was probably accurately recorded by the other members and employees of the firm.

So the arithmetic on these two applications goes as follows:
The four invoices attached to the First App total $596,288 in fees and $46,475.51 in costs, for a total of $642,763.51.
The Second App totals are $98,506.00 for fees and 11,778.77 for costs, totaling $110,284.77. Those two totals together equal $753,048.28.

The costs of $58,254.28, which is the total in both apps, are allowed in full. That leaves total fees from both apps in an amount of $694,794, from which I subtract (a) the $30,000 referred to above for the B190 work, and (b) the total billings for Mr. Coston in the sum of $109,364, leaving a remainder of $555,430. This figure I further reduce by 20% for reasons specified above, leaving a total of $444,344 that is allowed for fees, in addition to the $58,254.28 of costs.
==========
DELOITTE & TOUCHE, DELOITTE CONSULTING (together, "Deloitte" or "DT/DC"):
Total requested: $1,096,641.92, which includes a write down of $42, which "in essence creates a fee reduction for the Debtor." Project Summary from First Interim Fee Application, at 1 n.1.

This next paragraph addresses the issue of when in the case DT/DC should be allowed to start billing; DT/DC is allowed to further argue that issue, by filing a motion on the issue, if it wants. -----The application begins with work done as of February 21; however, given that the employment application was filed on March 14, 2001, that is the date from which billing can be approved for payment. I have considered again the issue of what happens when a very large global organization is asked to serve as a professional on very

short notice, and whether that ought to justify the post facto or nunc pro tunc employment of the firm, effective for some period of time after the filing of the petition but before the date of the filing of the employment application.  It seems to me there are two unsatisfactory solutions to the problem, and I do not have sufficient Solomonic wisdom to figure out a useful third alternative.  One would be to enforce the fairly strict (albeit not completely inflexible) rule that is in effect here in the district of New Mexico and which has been reinforced by the <u>Albrecht</u> decision: that is, absent very unusual circumstances, a professional simply may not claim reimbursement for a period prior to the filing of an employment application.  The other would be to make an exception to that rule in circumstances such as these.  I am still opting for the former.  It seems to me that on balance, the bright-line test of when employment and compensation begin has such a value that it ought to be maintained except in very unusual circumstances.  And a very large firm has to make a decision, and can make that decision, about how to keep growing and yet be flexible or agile enough to respond to employment opportunities that arise in the space of a day or two – and if it cannot, then it needs to consider whether that cost of growth is worth paying.  So any time that was billed, and any costs incurred, prior to March 14, 2002, will not be allowed.  That means as well that, when I say that "all" or the "entire" the compensation sought for any given category is allowable, I mean that all the time starting on March 14 but not any time billed for before that.-----------------------------

     In a related vein, I have a question about how appropriate it is to bill the estate for preparing to represent a committee or party by doing a conflicts check, when, it seems to me, a conflicts check is something that must necessarily be done before any representation, whether in or out of bankruptcy.  On the other hand, some allowance should be made for this category since the tests for disinterestedness and particularly conflicts of interest are in fact more rigorous inside bankruptcy rather than outside bankruptcy.  Concerning fee applications by contrast, outside of bankruptcy it is probably rather seldom that the firm needs to prepare and defend a fee application, although that could happen in certain contexts, such as civil rights or perhaps probate litigation.  Comparing the entries for category 107 in the first interim and the final (second) applications seems to show respectively that D&T/DC incurred $63,041.50 "on conflict clearing, retention, and billing issues throughout the case" and as much as $19,596.50 in preparing the two fee applications.  I find that those numbers themselves are sort of amazing; out of a bill of a little over $1mm, a little over 6% – over $60m – is spent just to make sure that the firm can participate in the case.  Clearly a large part of that has to do with the size of the firms themselves.  That DT/DC are so large that it takes tens of thousands of dollars to confirm that there are no conflict of interest, is simply a cost that the estate should not have to bear.  I will allow 10% for the conflict clearing, which is $6,304.15, which added to the $19,596.50 for preparing the fee applications, comes to $25,900.65 for category 107 fees, plus applicable GRT.

     On other issues, there will be no deduction for any overlap between Chanin's work and DT's work, since there is little evidence of such an overlap.  I also note that except for Mr. Forcum, no one billed at $600/hour, and almost everyone was substantially lower than the $600/hour.

     Also, I recognize the committee's desire to match nationally recognized and experienced firms in its employ with those of the DIP; <u>e.g.,</u> Skadden with Pepper, PwC with D&T, etc.  I have no argument with that as such.  But even then, the professionals' compensation will be judged on what value is

contributed.

First, concerning the leasehold work which Mr. Cohen said was absolutely essential because was it was the basis for going forward on hoped-for value for creditors, the lease valuations still did not require on-site visits, especially at the stage that the DIP was not meeting its (lowered-expectations) projections and everyone recognized (or should have recognized by the summer of 2001 – Mr. Barnett testified that they first started talking about this in March, sent staff to collect data toward end of May, and started project in June) that a sale for less than the secured claims against the estate was becoming more likely. Here Mr. Barnett chose to expand the work to get a higher quality answer. I don't question Mr. Barnett's sincerity and certainly not his commitment to quality; however, there are times when one simply cannot afford the higher priced product and needs to settle for the minimum needed to get the job done. Assuming a cost of roughly $4m per lease that could have been done for $1m (and they evaluated 3 office buildings, 3 warehouses, and 74 stores), but taking into account that there are necessarily some additional transaction costs and time incurred, the Court will allow 1/3 of the fees ($416,409.25 ÷ 3 = $138,803.08) and any GRT, plus all the applicable costs. (My recollection is that none of this work began until sometime after March 14 – Mr. Barnett testified it was in early June that Mr. Davis asked for the information -- so the issue of when the DT/DC employment began is not relevant for this category of work.)

Concerning the FMV of the business, the work done was useful and appropriate for the beginning of the case, especially when there was some issue of documents being supplied in a timely fashion and the debtor's general state of disorganization. (I am not blaming anyone about the dispute over document production, just pointing out that the lack of documentation made the work more difficult.)

The economic reporting on the debtor's situation was valuable for the estate in general and the committee in particular; if there is bad news, as there surely was here, it is better to know it sooner rather than later. I will allow the entire amount requested for both data analysis and business analysis.

Once the bad news began to become clear, it became incumbent on all the professionals, including D&T/DC, to start billing in a reduced manner. This is particularly the case when the professionals are billing at a blended rate of almost $300 per hour. (I recognize that the blended rate for the last two months of the billings considered - from September 1 through October 31 – the blended billing rate went from about $295/hour to $233/hour.) One of the reasons for paying relatively high rates to professionals is for their presumed ability to quickly recognize and react to the symptoms of a rapidly depleting estate. One example of how that could have been applied is to the preparation for and staffing of the committee meetings, called Meeting of Creditors (111). As pointed out above, the April 18 report showed just how badly the DIP's business was going, and DT/DC was in a better position than anyone else connected with the UCC to know that. And things did not get better after that, and again DT/DC knew about that as well. It is true that Mr. Forcum testified that based on his experience, a debtor in possession will drop in business the first few months before recovering. But given the losses that became acute in April and May, given what the DIP had started with prepetition (losing customers and foot traffic for lack of product on the shelves), and given the other circumstances of the case at that time, it behooved DT/DC to begin at least then to reduce spending. And nothing ever made that advice no longer relevant to this case. In consequence, the time

spent preparing for creditor meetings will be reduced by 20%, with the number being reduced being ($125,188.00 less the pre-March 14 amounts if I ultimately disallow the pre-March 14 amounts).

The Court also has a question about the numbers for the categories of financing (109), case administration (104), and employee benefits/pensions (106). The ultimate question is what benefit that work provided to the estate, a calculation that is, given the limitations of human nature, something of a rough cut in most instances, including in this case. I just cannot shake the concern that, taking into account the case overall, the charges in these categories were significantly beyond the value to the estate. Concerning category 109, once the DIP Financing Order was entered, on March 14 as it turns out, much of the financing issue was resolved, for good or bad, especially when the DIP refused to try to implement the trade lien. The entire amount for that category should be reduced by 20%. The case administration fee will be reduced by 20%, and the employee benefits/pensions work will be reduced by 25%, to reflect in part what a rabbit hole in effect the whole KERP project turned out to be.

With respect to the remainder of the categories, I will allow the entire amount requested.
-----Since I have not calculated with respect to each category what the March 14 and afterward sums are, I will leave that to the parties to calculate in the course of agreeing upon an order, and if they cannot reach an agreement, I will deal with it. In any event, once the total figures are figured for period from March 14 onward, and then from that number are subtracted the additional sums described above, the order should reflect what the amount is that is allowed to DT/DC.----------------------
======
Trustee's counsel should prepare the form of orders for all three applicants' various applications ruled on today.